# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

**KATHY CLEMONS,**                                                    **PLAINTIFF**
*Individually; as guardian of Elona*
*Clemons, a minor, and Keontray Clemons,*
*a minor; and on behalf of all wrongful*
*death beneficiaries of Tiara Renea*
*Clemons, deceased, and Aubrey Anna*
*Clemons, deceased.*

**v.**                                                    **CAUSE NO. 4:10-CV-209-CWR-FKB**
                                                    *consolidated with*
                                                    **CAUSE NO. 4:10-CV-210**

**UNITED STATES OF AMERICA**                                                    **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

On May 1 and 2, 2012, the Court held a bench trial in this medical malpractice case. Counsel for the plaintiff and counsel for the defendant announced ready, proceeded to trial, presented evidence, and finally rested. Having considered the evidence and applicable law, the Court now issues its findings of fact and conclusions of law.

Before proceeding, a preliminary statement is in order.

This case is about the tragic and senseless deaths of Tiara Renea Clemons and Aubrey Anna Clemons. They died because an emergency room doctor refused to provide them basic treatment.

The evidence revealed three especially terrible facts. First, the doctor's malpractice caused Tiara Clemons to suffer tremendously before her death. Second, the doctor's malpractice caused the death of Tiara's unborn child, Aubrey Anna, who at 30 weeks along was only a few weeks shy of birth. Third, the deaths of Tiara and Aubrey Anna were completely and utterly preventable. They would be alive today, but for the doctor's refusal to treat them. A more profound case of willful disregard can hardly be imagined.

The United States government indirectly employed the doctor in question. Acknowledging that there was no excuse for the doctor's incompetence, the government admitted liability. The sole dispute at trial was over the amount of damages recoverable by plaintiff Kathy Clemons, who is Tiara's mother, Aubrey Anna's grandmother, and guardian to Tiara's two surviving children. That

issue is resolved below.[1]

*I.    Stipulated Facts*

The following facts were stipulated by the parties in the Pretrial Order and are therefore accepted by the Court as true.  Docket No. 56.  The footnotes in this section help explain the stipulations but are not themselves stipulations.

1.      On June 27, 2009, Tiara Clemons was a 20 year old Native American female, and a citizen of the Choctaw Nation, residing in Choctaw, Neshoba County, Mississippi.  On June 27, 2009, Tiara received a puncture wound near the top of her right scapula.  At that time, Tiara Clemons was 30 weeks pregnant with Aubrey Clemons, a minor child.  As a result of the wound, Tiara Clemons sought medical treatment for herself and her unborn child from the Choctaw Health Center located in Choctaw, Neshoba County, Mississippi.

2.      At approximately 5:19 p.m., on June 27, 2009, Tiara Clemons was examined by Choctaw ambulance EMTs who responded to her call for assistance due to injuries received from a puncture wound to her back.  She was examined, and her vital signs were stable.  She was noted to be awake and alert, and sitting on the ground.  Importantly, the Choctaw EMT noted that she had "bilateral breath sounds clear to auscultation."  Her wound was bandaged, and she was not bleeding externally.  Tiara Clemons was given oxygen, and an IV was started on her left hand.  In that condition, Tiara Clemons and her unborn child, Aubrey Anna Clemons, were transported to Choctaw Health Center, recognized by the Mississippi Department of Health as a Level IV Trauma Center.

3.      Tiara and Aubrey Anna arrived at the Choctaw Health Center by ambulance at 5:22 p.m.[2]  They were not seen, examined, or triaged until 5:42 p.m.

4.      At 5:42 p.m., Jill Shaw, a family nurse practitioner, examined Tiara.  Nurse Shaw noted that Tiara was 30 weeks pregnant with Aubrey Anna, and recorded Tiara's pain at a "10" on a scale of 1 to 10, with 10 being the "most severe" pain.  Nurse Shaw ordered laboratory tests on

---

[1]  The deaths generated two lawsuits, which have been consolidated.  The first suit was filed by Kathy Clemons, as guardian of the minor children, Elona and Keontray Clemons, and on behalf of the wrongful death beneficiaries of Tiara Clemons (the mother of Elona and Keontray).  The second suit was filed by Kathy Clemons, as guardian of the minor children, Elona and Keontray Clemons, and on behalf of the wrongful death beneficiaries of Aubrey Anna Clemons (the sister of Elona and Keontray).

[2]  Testimony showed that the trip took no more than two minutes.  Trial Transcript 89-91 [*hereinafter* "Tr."].  The Clemons family lived less than a mile from the Choctaw Health Center.  *Id.*

Tiara's blood, a chest x-ray, and that a fetal monitor be placed on Tiara to monitor Aubrey Anna. At 5:42 p.m., Nurse Shaw obtained a blood pressure of 109/62.

5. At 5:45 p.m., Tiara and Aubrey Anna were examined by Dr. [Victoria] Guevarra, the ER doctor staffing the Choctaw Health Center Emergency Room. Dr. Guevarra noted that Tiara had received a stab wound in the right scapula, and that by 5:45 p.m., she had decreased breath sounds on the right upper fields. Dr. Guevarra ordered laboratory tests, and ordered that Tiara be given morphine for pain.

6. At 5:53 p.m., Tiara was taken to the radiology room very near the emergency room, where two chest x-rays were taken. The first x-ray was placed in the developer at 5:53 p.m. – the second at 5:57 p.m. These x-rays were available to be viewed by Dr. Guevarra in the emergency room no later than 6:00 p.m. By 6:10 p.m. Dr. Guevarra had reviewed the x-rays and was aware of the internal bleeding.

7. The 5:53 p.m. and 5:57 p.m. chest x-rays revealed that Tiara had a large right pleural effusion, with unilateral pulmonary infiltrate in the right lung, a hemothorax on the right with a fifteen to twenty percent pneumothorax on the right. Upon viewing the x-ray, Dr. Guevarra diagnosed Tiara with a pneumothorax in her right lung, and that she was bleeding internally.

8. At 6:21 p.m., Dr. Guevarra received the result of the blood tests previously ordered. The results showed diminished hemoglobin and hematocrit levels. By 6:40 p.m.,[3] Tiara had become hypotensive. Her blood pressure was recorded at 81/47.[4]

9. Between 6:50 p.m. and 7:05 p.m. Dr. Guevarra attempted to arrange a transfer of Tiara to Anderson Medical Center in Meridian, Mississippi, by ground ambulance. Dr. Guevarra called Anderson Regional Medical Center in Meridian, Mississippi, located about 40 miles distance, about a transfer. However, the ER doctor at Anderson denied Dr. Guevarra's request for transfer because Clemons was pregnant. Dr. Guevarra did not tell the doctor at Anderson that it was a life threatening situation regarding Clemons.[5] She did not contact or try to transport Clemons to

---

[3] This was approximately one hour and twenty minutes after Tiara arrived in the emergency room, and it was thirty minutes after internal bleeding was confirmed.

[4] This blood pressure reading was obviously lower than that recorded when she arrived. *See* ¶ 4, *supra*.

[5] No explanation for Dr. Guevarra's failure was provided at trial.

Neshoba County General Hospital, about 8 miles distance.

10. It was at least 6:50 p.m.[6] when Dr. Guevarra began trying to have Clemons transported to [a] medical facility with emergency services. Dr. Guevarra only began this process after being urged by CHC nursing personnel and Choctaw EMS personnel to have Clemons transported to a hospital.

11. Todd Harrison, one of the Choctaw EMT/paramedics, told Dr. Guevarra that Tiara was not stable enough to transport by ground ambulance, and told her to call the AirCare dispatch and send a helicopter to transport Tiara to University Medical Center ["UMC"] in Jackson, Mississippi, a Level I Trauma Center. Dr. Guevarra then called for the UMC AirCare helicopter to transport Tiara. When contacted, UMC immediately dispatched a helicopter with EMT personnel.[7] Dr. Guevarra did not relay that CHC had no blood nor ability to drain fluids from Clemons' chest.

12. At approximately 7:00 p.m., Dr. Guevarra ordered another chest x-ray, which revealed a "massive" right hemothorax.

13. At 7:30 p.m., Tiara Clemons was assessed by the UMC AirCare EMTs upon their arrival at the Choctaw Health Center. Upon assessment, Tiara was hypoxic, hypotensive, and worsening. Her blood pressure had fallen to 82/54, her oxygen saturation was at 86%,[8] and her respirations were 36.[9] The UMC EMTs noted the massive hemothorax visualized on the chest x-ray. Tiara was gasping for breath, and no breath sounds could be heard on the right side of her chest. The UMC EMTs requested that Dr. Guevarra perform a thoracostomy. EMT medical notes reflect that Dr. Guevarra repeatedly refused to perform the thoracostomy, a procedure which involves

---

[6] Nearly an hour and thirty minutes after Tiara arrived in the emergency room.

[7] Evidence shows that UMC AirCare was called and dispatched at 6:47 p.m. PX-37, at 3. The UMC EMTs arrived on the scene at 7:23 p.m. *Id.*; *see* Tr. 114.

[8] "Oxygen saturation" means the concentration of oxygen in the blood. Tr. 59. The responding paramedic testified that the oxygen saturation number "gives us a good indication of how well the patient is breathing, as long as it's 95 percent or above at this time we didn't supply supplemental oxygen unless we thought we we they needed it." *Id.* at 93.

[9] Testimony indicated that Tiara was "breathing twice as fast as she normally should be." Tr. 53.

inserting a tube into Clemons' chest to drain the blood, despite requests by UMC EMT.[10]  The UMC EMTs also requested that Dr. Guevarra give blood to Tiara Clemons.  Dr. Guevarra did not order blood to be given, and informed that none was available at the Choctaw Health Center.

14.  At approximately 7:30 p.m., the UMC EMTs noted that there was a failure to protect Tiara's airway, and intubated Tiara at 7:35 p.m.  At 7:45 p.m., due to observed cyanosis (turning blue), decreased breath sounds, severe shortness of breath, decreased cardiac output, low oxygen and oxygen saturation rates, the UMC EMTs performed a needle thoracostomy on the right chest, which returned approximately 300 ml of air and blood.[11]

15.  At 8:09 p.m., the UMC AirCare EMTs departed for UMC in the helicopter with Tiara and Aubrey Anna.  Measured at 8:15 p.m. and 8:30 p.m., Tiara's oxygen saturation level was 42%.  By 8:40 p.m., Tiara's oxygen saturation level had dropped so low that it was incapable of measurement, and was recorded as "0%".

---

[10]  One UMC EMT testified that Dr. Guevarra "said she did not feel comfortable doing [the chest tube insertion], that she was a family doctor and that she was not going to do it."  Tr. 120.  This exchange followed:
Q [by counsel for plaintiff]. So is it fair to say at 7:30 p.m. you warned Dr. Guevarra . . . if she didn't put that chest tube in both Tiara and the baby were going to die?
A [by UMC EMT]. Yes.
Q. In response to that warning did she take any other action?
A. No.
Q. What did she do, if anything?
A. Honestly she she left the room.
Q. Did she come back?
A. I did not see her after that.
Q. So after the warning she basically left you and Mr. King to treat Tiara and Aubrey Anna?
A. Yes.
Q. And no other physician came?
A. I did not see any.
*Id.* at 121.  The UMC EMTs even offered to show Dr. Guevarra how to insert a chest tube "and basically coach her through the process," since they had seen the simple procedure done many times, but were rebuffed.  *Id.* at 127, 136-37, 148-49.  (The EMTs were not authorized to perform the procedure themselves.  *Id.* at 69-70, 138.)  In her deposition, Dr. Guevarra confirmed that she declined to insert a chest tube.  PX-49 at 142-44.
Plaintiff's expert Dr. Stodard testified that physicians at a Level IV trauma center should "absoutely" have been able to insert a chest tube, as that was an "essential" procedure.  *Id.* at 35.  "[I]f you can't do that you should not have trauma patients coming to your door."  *Id.*; *see also id.* at 198-99 (testimony of Dr. Owens that "[m]ost upper level providers have had some degree of experience [inserting chest tubes]. . . . The people who are in critical care situations are very well versed in them.").

[11]  300 ml is slightly more than 10 ounces.  The UMC EMT testified that this procedure produced "the most [blood] I've ever seen out of a needle [thoracostomy]," and concluded that Tiara's "hemothorax was very very significant."  Tr. 126.  And yet it would not have been necessary if the physician had inserted a chest tube.  *Id.* at 26.  A needle thoracostomy is "a quick fix" only, performed "just to buy you some time," because it does not drain as much blood as a chest tube, and because the blood continues to flow into the lung.  *Id.* at 26, 58-59, 127-28.

16.     At 8:42 p.m., as the AirCare helicopter was approaching UMC, while over the VA Hospital,[12] Tiara went into cardiac arrest. At 8:44 p.m., Advanced Cardiac Life Support protocols were employed by the EMTs, including administration of atropine and epinephrine. From 8:44 p.m. until 8:54 p.m. cardiopulmonary resuscitation (CPR) was performed. At 8:45 p.m., the UMC EMTs performed a needle thoracostomy to Tiara's left chest, which returned 20 ml of air and blood. At 8:50 p.m., the UMC EMTs delivered Tiara to the UMC emergency physicians.

17.     At 8:50 p.m., the UMC emergency physicians performed a thoracostomy and inserted bilateral chest tubes. The chest tube on the right returned 2400-2500 cc's of blood.[13] A cardiac ultrasound was performed, which revealed no cardiac activity present in either Tiara or Aubrey Anna.

18.     At 8:52 p.m., Aubrey Anna was delivered by emergency Caesarean section, but showed no signs of life. CPR was continued on Tiara Clemons. At 8:54 p.m., another cardiac ultrasound was performed. With no cardiac activity noted, Tiara Clemons and Aubrey Anna Clemons were pronounced dead.

19.     At all material times, Dr. Victoria Guevarra, Jill Shaw, FNP, and all other individuals who provided medical care and treatment to Tiara Clemons and Aubrey Anna Clemons were acting in the course and scope of their employment with the Choctaw Health Center, a healthcare facility owned and operated by, and located on property occupied by, the Mississippi Band of Choctaw Indians, in Choctaw, Mississippi.

20.     The United States of America, Defendant, is statutorily and at common law responsible for the wrongful and negligent acts, if any,[14] with respect to Tiara Clemons and Aubrey Anna Clemons which occurred at the Choctaw Health Center, located on property occupied by the

---

[12] The Court will note that the VA Hospital is next door to UMC.

[13] This is approximately 2.5 *liters* of blood – a shocking amount.

[14] While this stipulation hedges on the existence of any wrongful or negligent acts by using the term "if any," the United States conceded liability shortly before trial. Stipulation Nos. 22-25 confirm that employees of the United States breached the standard of care, causing Tiara and Aubrey Anna's deaths.

Mississippi Band of Choctaw Indians, in Choctaw, Mississippi.[15]

21.     As the sole wrongful death beneficiaries of Tiara Clemons and Aubrey Anna Clemons, deceased, Elona Clemons and Keontray Clemons, by and through Kathy Clemons and Bill Clemons, Guardians, are entitled to assert and prosecute a claim for damages arising out of the wrongful death of Tiara Clemons and Aubrey Anna Clemons.

22.     The care rendered to Tiara and Aubrey Anna Clemons on June 27, 2009 did not comply with, and fell below, the standard of care applicable to the Choctaw Health Center, and Dr. Guevarra.

23.     Dr. Guevarra and the Choctaw Health Center breached the applicable standard of care while rendering medical care and treatment to Tiara and Aubrey Anna Clemons.  The breach of the standard of care included a failure to timely transfer Tiara and Aubrey Anna to a healthcare facility with additional treatment capabilities, and/or failing to insert a chest tube, i.e., perform a thoracostomy, to protect Tiara Clemons' airway.

24.      Had Tiara and Aubrey Anna Clemons received treatment at the Choctaw Health Center consistent with the applicable standard of care, i.e., timely transfer to a healthcare facility with additional treatment options available and/or insertion of a chest tube, both Tiara and Aubrey Anna Clemons would have survived intact.

25.     The breaches of the standard of care of Dr. Guevarra and the Choctaw Health Center

_____

[15] The government has explained the situation as follows:

> The CHC is a Section 638 contract facility (Public Law 93-638), operated pursuant to the Indian Self- Determination and Education Assistance Act, 25 U.S.C. § 450f(a) (1994).  The Act provides that tribes may enter into self-determinative contracts with the Secretary of the Interior and the Secretary of Health and Human Services (HHS) to administer programs or services that otherwise would be administrated by the federal government.  For the purposes of 42 U.S.C. § 233, such tribal facilities are deemed part of the Public Health Service, and their employees are deemed Public Health Service Employees while acting within the scope of their employment in carrying out the contract. The FTCA provides the exclusive remedy for any related claims.  However, neither the Department of the Interior or HHS has any authority or input to the employment of any person providing care at such facilities.  Their employment is exclusively a matter of tribal control.  While HHS could arguably decertify a facility such as CHC, such action would involve political decisions at the highest level of the federal government and would  be characterized as actions between nations, i.e. the United States and the Choctaw Tribe.  Any amounts paid as damages in the present case will come from the judgment fund of the United States and not from the Choctaw Tribe.

Docket No. 61, at 4 n.2.

while rendering medical care and treatment to Tiara Clemons and Aubrey Anna Clemons were a proximate cause of the deaths of Tiara Clemons and Aubrey Anna Clemons.

26.     On June 27, 2009, Tiara Clemons was stabbed by an individual, consistent with the notations in the medical records and autopsy report.[16]

27.     The medical expenses associated with Tiara Clemons and Aubrey Anna Clemons treatment at University Medical Center on June 27, 2009 and the funeral expenses of Tiara Clemons and Aubrey Anna Clemons were paid by the Mississippi Band of Choctaw Indians.

28.     Subsequent to June 27, 2009, Dr. Guevarra was removed from staffing the emergency room at Choctaw Health Center as an emergency physician.[17]

## II.    *The Court's Findings*

This wrongful death suit was brought pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*  Docket No. 1, at 2.  On March 2, 2010, Kathy Clemons mailed two SF-95s – one for each decedent – and a thorough Notice of Claim to the government.  *Id.* at 10-22; PX-4. All pre-suit administrative requirements were satisfied.

"[T]he FTCA requires the Government's liability to be measured in accordance with the law of the state where the alleged act or omission occurred."  *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Mississippi Plaintiffs)*, 668 F.3d 281, 287 (5th Cir. 2012) (citations omitted). Accordingly, this Court applies Mississippi substantive law to Clemons' claims.

Under Mississippi's wrongful death law, Kathy Clemons is an appropriate representative to file suit on behalf of herself and Tiara Clemons' children.  Miss. Code § 11-7-13; PX-34; PX-35.

---

[16]  The individual is Tiara's sister, Marena Clemons, who for her act was charged with a crime under tribal law and served time in the tribe's custody.  Tr. 176-77.  For several factual and legal reasons, however, Marena is not liable for Tiara and Aubrey Anna's deaths.

The facts show that the stab wound was relatively minor and not the proximate cause of the deaths.  The paramedic dispatched to the Clemons' home testified that Tiara's stab wound "was just a slit in the skin" that did not look bad and was not bleeding.  *Id.* at 92-93.  At that point Tiara was breathing well, had normal vital signs, and did not want to go to the hospital.  *Id.* at 93, 95.  Her mother testified that Tiara was calm and not experiencing any physical difficulties then.  *Id.* at 164-65.  The injury should have been easy to repair and resolve.

Further, as will be discussed later, the parties agree that under Mississippi law, "no fault or responsibility for the death of Tiara or Aubrey Anna Clemons can be apportioned or assigned to Marena Clemons or any other intentional tortfeasor for purposes of reducing or mitigating liability attributable to the United States for the deaths, or damages owed by the United States to the wrongful death beneficiaries."  *See* Part III, *infra*; Docket No. 61, at 9.

[17]  Dr. Guevarra continued to staff the emergency room at Choctaw Health Center for several months after Tiara and Aubrey Anna's deaths.  PX-49 at 174.

The statute states that she "shall recover such damages allowable by law as the jury may determine to be just, taking into consideration *all the damages of every kind to the decedent and all damages of every kind to any and all parties interested in the suit*." Miss. Code § 11-7-13 (emphasis added). "Compensation in a wrongful death action is not limited to actual damages and lost wages, but extends to the pain and suffering of the deceased, as well as the loss of companionship and society." *Delta Reg'l Med. Ctr. v. Venton*, 964 So. 2d 500, 506 (Miss. 2007) (citation omitted).

Kathy Clemons may recover for the wrongful deaths of Tiara and Aubrey Anna with no distinction made for Aubrey Anna being a 30-week old fetus in the womb. Mississippi's wrongful death statute states that recovery may be made for the wrongful death of persons or "any unborn quick child." Miss. Code § 11-7-13; *see 66 Fed. Credit Union v. Tucker*, 853 So. 2d 104, 107 (Miss. 2003) ("When a family loses a potential member because of tortious conduct of another, it suffers an injury of the same order as when it loses an existing member."). It is undisputed that Aubrey Anna was 'quick in the womb' and viable outside of the womb. Trial Transcript 183, 200 (testimony of Dr. Owens) [*hereinafter* "Tr."]; *see Tucker*, 853 So. 2d at 107, 110-12 (discussing 'quickening' and viability). Accordingly, Kathy Clemons may recover for the wrongful deaths of both Tiara and Aubrey Anna.

Before continuing, the Court must emphasize that its determination of the amount of damages properly recoverable in this case is in no way a declaration of the value of Tiara or Aubrey Anna's lives. It is not possible to assign a dollar value to anyone's life. As the Mississippi Supreme Court wrote over 80 years ago, "the loss sustained by a wife and children in the death of the husband and father frequently cannot be compensated by any amount of money." *Gulf Ref. Co. v. Miller*, 121 So. 482, 483 (Miss. 1929); *see also Dickey v. Parham*, 331 So. 2d 917, 919 (Miss. 1976) ("how to test the adequacy or inadequacy of verdicts in a wrongful death action is a most perplexing problem. This is true because the value of human life even when considered along with applicable elements of damages is difficult of proof."); Weems & Weems, Mississippi Law of Torts § 14:10 (2d ed. 2008).[18] An award of monetary damages is simply the means by which our system of justice seeks

---

[18] This case magnifies the enormous difficulties inherent in wrongful death damages awards. Somehow dollar amounts must be assigned to the grief the decedents' loved ones endured because of the medical providers' negligence. As noted by one commentator: "Grief is a readily foreseeable and very real consequence of wrongful death. It can kill a human spirit as effectively as a motor vehicle crash can still a beating heart. Survivors of persons lost to sudden violent death suffer not only the lifetime loss of their loved one, but trauma induced by the loss and

to repair some of the loss and harm inflicted upon the victim and the victim's family.

The parties' various disputes concerning damages are resolved as follows:

*A.     Economic Damages*

Mississippi law defines economic damages as:

> objectively verifiable pecuniary damages arising from medical expenses and medical care, rehabilitation services, custodial care, disabilities, loss of earnings and earning capacity, loss of income, burial costs, loss of use of property, costs of repair or replacement of property, costs of obtaining substitute domestic services, loss of employment, loss of business or employment opportunities, and other objectively verifiable monetary losses.

Miss. Code § 11-1-60(1)(b).

The plaintiff put forward evidence of $31,394 in reasonable and necessary medical expenses and $4,014 in funeral expenses. The United States does not challenge either amount. They will be awarded.

1.     Tiara's Economic Damages

The plaintiff called Dr. G. Richard Thompson to provide expert testimony about Tiara's economic damages, while the defendant called James A. Koerber for the same purpose. The Court will take up lost earnings first, then turn to the value of household services.

The experts' estimates of Tiara's lost earnings differed based upon their assumptions. For example, the plaintiff's expert's report had a high-end estimate of $1.19 million, PX-31 at 8, while the defendant's expert's low-end estimate was $256,497, DX-1 at App'x A.[19] The Court will wade through several of these assumptions and determine which model is generally more persuasive.[20]

---

the manner in which it occurred." Andrew J. McClurg, *Dead Sorrow: A Story About Loss and a New Theory of Wrongful Death Damages*, 85 B.U. L. Rev. 1, 9-10 (2005). In addition, Tiara and Aubrey Anna actually endured pain and suffering prior to their deaths. In fact, Tiara saw death, but she could not turn her head or do anything to slow or stop it, which must have increased her anxiety. She was not here to testify about the emotion and feeling which engulfed her during this tragedy. The difficulty of placing a dollar figure on these and other intangibles does not escape the Court.

[19] All of these figures have been reduced to present value.

[20] The Court is necessarily constrained by its inability to conduct its own analysis. It cannot decide that one expert's take on two variables is better reasoned, import them into another expert's overall more compelling approach, and re-run the model. Instead, the Court can choose between variables only where the experts have provided differential analyses; and then, from what remains, select the more persuasive overall analysis.

The first dispute concerns the number of years Tiara could be expected to work. The plaintiff's expert assumed, based on certain sources, that Tiara would work until the normal retirement age of 67. PX-31 at 5. The defendant's expert assumed, based on other sources, that Tiara would work for approximately 21 and a half years. DX-1 at 6. The defense expert's assumption was based upon a study of "initially inactive women with less than a high school education." DX-1 at 10. Tiara did have some work experience, so it is not immediately obvious that she matches the "initially inactive" description. But grouping Tiara with the findings of that study is also not quite apt because the evidence indicated that Tiara was completing her GED, and therefore should be treated as a high school graduate, not a high school dropout. *See Rebelwood Apartments RP, LP v. English*, 48 So. 3d 483, 495-96 (Miss. 2010) (discussing caselaw affirming trial judge's decision to apply college-graduate average wages to decedents who were enrolled in college but had not yet completed college). All in all, the plaintiff's expert's assumption is more compelling on this point.[21]

Another disputed assumption is Tiara's expected tax rate. The plaintiff's expert testified that with three children and relatively modest earnings, Tiara's taxes would be negligible. Tr. 230-31, 239; PX-31 at 6. The defendant's expert assumed a greater rate, especially if Tiara went on to obtain a two-year degree. DX-1 at 6. The Court agrees that the former approach more closely matches our situation.

The contested assumption of most significance is how much education Tiara ultimately would have completed. Lifetime wages for graduates of community colleges are, on average, higher than lifetime wages for GED recipients. PX-31; DX-1; Tr. 235-36. As a result, each expert made two calculations, one for Tiara completing community college and one for her without that

---

[21] During its cross-examination of Dr. Thompson, the defendant suggested that it was improper to calculate Tiara's lost wages using her expected retirement age, pointing to language in *Rebelwood Apartments RP, LP v. English*, 48 So. 3d 483, 496 (Miss. 2010). Tr. 250-53. In that case, the Mississippi Supreme Court reversed and remanded a jury verdict in part because an economist's expert opinion was unreliable under *Daubert*. *Rebelwood*, 48 So. 3d at 494.

The defendant's challenge was surprising because it had not complied with the Local Rules' requirement that *Daubert* motions be filed well in advance of trial. *See* L.U.Civ.R. 26(a)(3) ("Daubert motions challenging a designated expert must be filed no later than the deadline for dispositive motions or other deadline for such motions established by the case management order or other order, whichever is later."). Nor had the defendant moved at trial to exclude Dr. Thompson's opinions; in fact, it took the opportunity to voir dire Dr. Thompson, then stated that it had no objection. Tr. 224-25. The defendant's *Daubert*-based argument is unavailing.

credential. Within that latter category, the experts appear to have made a further distinction: the plaintiff's expert assumed Tiara's wages as a GED holder, while the defense expert assumed Tiara's wages in a minimum wage-only job. *Compare* PX-31 at 6 *with* DX-1 at 6.

On review, the available evidence was more supportive of Tiara completing her GED and entering the workforce without a two-year degree. Tiara's mother testified that after completing her GED, which Tiara was only two classes away from finishing, Tiara had said she would work for the tribe and raise her children. Tr. 175. On prompting by counsel, testimony was elicited that Tiara wanted to attend college, but the answer soon returned to working for the tribe and raising children. *Id.* at 178. Given the testimony and evidence, it is more likely that Tiara would have completed her GED and returned to the workforce directly.[22] *See id.* at 174-78; DX-4. At the same time, the Court disagrees with the defense expert's apparent restriction of Tiara to minimum wage-only jobs, and adopts the range of wages applicable to GED holders.[23]

All in all, the Court will adopt the plaintiff's expert's general model, credit the defendant's argument as to Tiara's reasonably expected education level, and accept the plaintiff's expert's reduction at trial (based upon the personal consumption rate), to assess Tiara's economic damages at $740,764. Tr. 241, 254-55.

Finally, both parties' experts agreed that a component of Tiara's economic damages should be $133,969 in lost household services. Those damages will be awarded.

Consequently, Tiara's economic damages are $874,733.

2.    Aubrey Anna's Economic Damages

Again, the calculation will be broken down into lost earnings and lost household services.

The Court's general assessment of the competing expert models applies to Aubrey Anna's lost earnings. The plaintiff's expert's overall model will be applied and reduced to take into account Aubrey Anna's expected personal consumption rate. The most significant question remaining concerns Aubrey Anna's education level: would she have completed high school before entering the workforce, or gone on to complete a two-year degree?

---

[22] Even though it is possible for a non-high school graduate, non-GED holder to enroll in community college in Mississippi.

[23] Another reason Tiara should not be limited to minimum wage jobs is that one of her prior employers paid her more than the minimum wage. Tr. 329.

It is impossible to answer this question with certitude.  Aubrey Anna had no education or work history upon which to base a conclusion about her lost earnings.  That does not preclude an award of damages, of course.  *See TXG Intrastate Pipeline Co v. Grossnickle*, 716 So. 2d 991, 1016-17 (Miss. 1997) ("It is well recognized that Mississippi is equally firm in its determination that a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused. . . . Where the existence of damages has been established, a plaintiff will not be denied the damages awarded by a fact finder merely because a measure of speculation and conjecture is required in determining the amount of damages.") (quotation marks, citations, and brackets omitted); *see also Choctaw Maid Farms, Inc. v. Hailey*, 822 So. 2d 911, 918 (Miss. 2002) ("there is no exact yardstick for determining [lost income] damages") (quotation marks, citation, and brackets omitted).  But it does mean the Court must weigh carefully the evidence, as well as guidance from other courts.

For these situations, the Mississippi Supreme Court has provided the following guidance:

> The conclusion by the Court of Appeals that the income for the children should be based on some sort of average income for persons of the community in which they lived, as far as we can find, has no basis in our law.  Additionally, such a method is just as speculative as basing the recovery on the earning history of the parents.  It is both unfair and prejudicial to ground the projected future income of a deceased child on either basis.  Both methods result in potentially disparate recoveries for children from affluent communities or with affluent parents, as opposed to children from less affluent areas or with less affluent parents.

> Who is to say that a child from the most impoverished part of the state or with extremely poor parents has less of a future earnings potential than a child from the wealthiest part of the state or with wealthy parents?  Today's society is much more mobile than in the past.  Additionally, there are many more educational and job-training opportunities available for children as a whole today. We must not assume that individuals forever remain shackled by the bounds of community or class. The law loves certainty and economy of effort, but the law also respects individual aptitudes and differences.

> Therefore, we hold that in cases brought for the wrongful death of a child where there is no past income upon which to base a calculation of projected future income, there is a rebuttable presumption that the deceased child's income would have been the equivalent of the national average as set forth by the United States Department of Labor.  This presumption will give both parties in civil actions a reasonable benchmark to follow in assessing damages.  Either party may rebut the presumption by presenting relevant credible evidence to the finder of fact.  Such

evidence might include, but is certainly not limited to, testimony regarding the child's age, life expectancy, precocity, mental and physical health, intellectual development, and relevant family circumstances. This evidence will allow the litigants to tailor their proof to the aptitudes and talents of the individual's life being measured.

*Greyhound Lines, Inc. v. Sutton*, 765 So. 2d 1269, 1276-77 (Miss. 2000). It follows that this Court cannot base Aubrey Anna's expected education level upon her mother's education level. Such a conclusion would be at odds with the greater number of opportunities available to Aubrey Anna and other children in her generation. *See id.* And there is no "relevant credible evidence" from either party to bolster or rebut the presumption of using national benchmarks. *Id.* The defendant was given ample opportunity to rebut the presumption but failed to do so.

If the Mississippi Supreme Court is correct that we live in a more upwardly-mobile society, with "many more educational and job-training opportunities available for children" today than in the past, it is reasonable to expect Aubrey Anna to somewhat exceed her mother's educational achievement. *Id.* The Court may also take judicial notice of America's history of increased educational attainment, *i.e.*, the fact that over time the percentage of the population that graduates from high school and college has risen substantially.

For example, between 1940 and 2009 there was "more than a three-fold increase in high school attainment and more than a five-fold increase in college attainment." U.S. Census Bureau, *Educational Attainment in the United States: 2009*, at 1, Feb. 2012, *available at* http://www.census.gov/prod/2012pubs/p20-566.pdf. The graphical representation of this trend shows that the increase is fairly consistent and continues to present day – or, more accurately, to 2009, the most recent year data were available. *Id.* at 3; *see generally* Gage Raley, *Yoder Revisited: Why the Landmark Amish School Case Could -- And Should -- Be Overturned*, 97 Va. L. Rev. 681, 696-97 (2011) (collecting figures showing a substantial increase in educational attainment in the United States over the past 35 years, and attributing the dramatic rise to a stronger, more direct "link between secondary education and business," the fact that "more jobs now demand greater educational skills," "[i]ncreasing global competition," and states' recognition that they are engaged in an "educational arms race") (quotation marks and citations omitted); Bill Ong Hing, *NAFTA, Globalization, and Mexican Migrants*, 5 J.L. Econ. & Pol'y 87, 136 (2009) ("Younger and older workers alike are now more educated as the share of adult native-born men without a high school

diploma have plunged, from 53.6% in 1960 to 9.0[%] in 1998. During that same period, the share with college degrees has gone up from 11.4% to 29.8%.") (citation omitted).

It bears repeating that no one, not even the capable experts who testified in this suit, can predict accurately what Aubrey Anna would have earned had she survived. She was only 30 weeks old. The Court – which has been given only two options, high school completion or two-year degree holder – must make a reasonable guess informed by prior caselaw, national averages, and long-term trends. It concludes that Aubrey Anna would more likely than not move at least one rung up the ladder of economic opportunity. As a result, her grandmother will be awarded $773,280 for lost earnings.[24] *See* Tr. 243-44.

The parties dispute whether the plaintiff may recover the value of Aubrey Anna's lost household services. The plaintiff's expert recommended that they be awarded on essentially the same terms as Tiara's lost household services. Tr. 245. The defendant's expert thought none were warranted because of an assumption that Aubrey Anna would live alone. DX-2 at 15. Testimony supported that Aubrey Anna would probably not live alone. Tr. 158-60. The plaintiff will be awarded $133,969 for Aubrey Anna's lost household services.

As a result, Aubrey Anna's total economic damages are $907,249.

B.     *Non-Economic Damages*

Mississippi law defines non-economic damages as:

> subjective, nonpecuniary damages arising from death, pain, suffering, inconvenience, mental anguish, worry, emotional distress, loss of society and companionship, loss of consortium, bystander injury, physical impairment, disfigurement, injury to reputation, humiliation, embarrassment, loss of the enjoyment of life, hedonic damages, other nonpecuniary damages, and any other theory of damages such as fear of loss, illness or injury.

Miss. Code § 11-1-60(1)(a).

---

[24] The Court makes this finding notwithstanding the parties' unnecessarily myopic perspective on Aubrey Anna's expected educational attainment. The problem was illuminated most clearly when counsel for the plaintiff cross-examined the defendant's expert economist. The expert failed to reconcile how in another case he had assumed that a deceased five-year old could have attended a four-year college, but here would not assume that Aubrey Anna, a 30-week old fetus, could have attended a four-year college. *See* Tr. 295-96, 304; *see* PX-55, at 5. Further, when questioned by the Court, the expert admitted that "most economists" would include a scenario where the child would finish college. Tr. 304. Yet here no such scenario was presented by either side's expert economist. Both parties should have considered whether Aubrey Anna could have attended a four-year college.

1.      Tiara's Pain and Suffering

At trial, the plaintiff called Dr. Michael Stodard to provide expert testimony on Tiara's condition.  Dr. Stodard testified that Tiara's stab wound caused air and blood to flow into her chest cavity and slowly fill up the space normally occupied by her lung, causing respiratory distress.  Tr. 22-24, 31, 43; PX-27 at 4.  In addition, as the air and blood collected, they started to press against Tiara's lung and heart, which pushed the lung toward collapse and impeded the heart's ability to fill up and pump blood.  Tr. 23-24.

Dr. Stodard testified that respiratory distress results in shortness of breath, suffocation, feelings of smothering, anxiety, restlessness, and "a sense of impending doom."  *Id.* at 24-25.  Not only does the patient know that their breathing is impaired, but the body's failure to oxygenate – how the lungs exchange oxygen into red blood cells, and the heart pumps that blood around the body – makes the patient feel like they are going to die.  *Id.* at 25.  Shock and a steadily decreasing blood pressure can result as the distress escalates.  *Id.*  Dr. Stodard explained that all of these symptoms could have been stopped with insertion of a chest tube, which provides immediate relief by draining the chest cavity and permitting the lung to expand.  *Id.* at 26, 28.

Tiara was in distress by 5:42 P.M. and reported a 10 out of 10 pain level at that time.  *Id.* at 37; PX-36 at 1.  Dr. Guevarra testified in a deposition that Tiara was "screaming from pain and very restless," and in obvious pain and distress.  PX-49 at 133, 170-71.  By 6:40 P.M., Tiara had gone into shock and had an abnormally low blood pressure because too much of her blood was in her chest cavity and not circulating through her body.  Tr. 44.  Dr. Stodard testified that she was experiencing extreme anxiety and distress, accompanied by a feeling of suffocation and impending doom.  *Id.* at 45.

By 7:00 P.M., a chest x-ray[25] showed that approximately half of Tiara's blood was in her chest cavity, indicating that she was in hemorrhagic shock.[26]  *Id.* at 48, 56; *see id.* at 119.  That condition is associated with greater physical and emotional suffering, including feelings of

---

[25]  Dr. Guevarra initially refused to order this x-ray and approved it only after an EMT's second or third request.  Tr. 104-05.

[26]  The evidence shows that Tiara needed additional blood in order to keep blood circulating through her body.  PX-52 at 39-43.  The Choctaw Health Center, though, had no blood on hand and no place to keep blood.  PX-49 at 158; *see also* PX-6 at 3 (Defendant's Responses to Plaintiff's First Request for Admissions).  Nor did it have a machine that could take Tiara's recovered blood and re-circulate it through her body.  PX-52 at 42.

smothering. *Id.* at 49, 119.

Half an hour later, Tiara was gasping for breath and likely felt like she was drowning, Dr. Stodard said. *Id.* at 52, 80. She could not lay flat because the blood in her chest would have increased the pressure on her heart. *Id.* at 54. Instead, she was upright and leaning forward slightly in the tripod position, which helps keep blood away from the heart.[27] *Id.*; *see id.* at 102 (testimony of EMT), 166 (testimony of UMC EMT). She told the UMC EMT that she was hurting and having a hard time breathing, and later begged, "please help me." *Id.* at 117, 123. At one point, her mother testified, Tiara looked to be in fear of dying and said she was scared. *Id.* at 167-68. Dr. Guevarra admitted that Tiara was crying out for help. PX-49 at 172.

Dr. Stodard testified that Tiara's death was a slow process, during which she was conscious and aware of what was going on around her, as well as conscious of her own mortality. Tr. 56, 75-76. Later administration of a sedative (morphine) and a paralytic rendered Tiara unconscious and paralyzed until her death. *Id.* at 82, 147.

At times, the defendant argued that Tiara suffered relatively little because morphine was provided at or around 5:45 P.M., and also because Tiara became unconscious while being evacuated to UMC. *Id.* at 323, 325; *see* Stipulation No. 5. But the considerable evidence recited above shows the degree of her pain and suffering between the first administration of morphine and her later, final fall into unconsciousness. At other times, in fact, the defendant did not deny that Tiara's death was slow and painful, and that she was conscious of it. Tr. 75. It later acknowledged the pain, significant difficulty breathing, and "awful" panic she suffered. *Id.* at 323, 325.

Taking all of this into account, the evidence shows that Tiara suffered tremendously, both physically and mentally, before dying. The Court will award $1.5 million for her pain and suffering and $500,000 for her mental anguish. *See Motorola Comm. & Electronics, Inc. v. Wilkerson*, 555 So. 2d 713, 724 (Miss. 1989); *see also Hailey*, 822 So. 2d at 927-28 (Cobb, J., concurring in part and dissenting in part).

This award is lower than those in other, reasonably similar cases. For example, last year the Mississippi Court of Appeals affirmed a jury verdict that awarded an estate $2.25 million for a

---

[27] There was some discussion at trial about the tripod position being a natural or instinctive stance the body adopts to facilitate breathing. Tr. 136.

woman's pain and suffering and mental anguish before death. *Mississippi Baptist Health Sys., Inc. v. Kelly*, 88 So. 3d 769, 780 (Miss. App. 2011).[28]

> The jury found during this period that [the decedent] suffered an allergic reaction, which included itching, redness of the face, blisters on the lips, and nausea. As her reaction progressed, she struggled to breathe due to the anaphylactic reaction. The reaction caused Ellen's bronchoconstriction, heart arrhythmia, respiratory arrest, and a severe drop in blood pressure. There is no doubt she suffered physical agony and mental anguish as she struggled to breathe. In fact, she had to be intubated in order to breathe. She also experienced heart arrhythmia, which is typically characterized by severe chest pain. As her reaction continued, the flow of blood to her brain decreased, which led to extreme swelling of her brain and ultimately a brain stroke and infarction. She remained in the ICU for four days until her family decided to end her suffering and disconnect the ventilator.

*Id.* These symptoms were similar to those Tiara suffered at the Choctaw Health Center. Tiara's lower award is not disproportionate or unreasonable.

>    2.    Aubrey Anna's Pain and Suffering

The plaintiff introduced, via deposition, the expert testimony of Dr. John P. Elliott, a specialist in maternal fetal medicine, which is also known as high-risk obstetrics. PX-52, at 7. Dr. Elliott testified that Aubrey Anna was entirely dependent upon Tiara receiving adequate oxygen. *Id.* at 25. When Tiara's oxygen supply was restricted, Aubrey Anna's health also suffered. *Id.* at 31.

For example, Aubrey Anna's heart rate, which was recorded via fetal heart monitor once at 5:45 P.M. and once more at a later (unknown) time, showed increased stress as a result of Tiara's deteriorating condition. *Id.* at 30-31. (Dr. Guevarra admitted as much at her deposition. PX-49 at 134.) As Dr. Elliott put it, Aubrey Anna "was responding to stress by increasing [her] heartbeat. Probably the lack of oxygen that was going on with the mother was affecting the baby at that point, and the baby is pumping its blood faster to get more oxygen per minute." PX-52 at 31.

The lack of oxygen in Tiara's body caused a placental abruption – which means part of the placenta separated from Tiara's uterus – and fatally decreased the oxygen being delivered to Aubrey Anna. *Id.* at 25-26, 52. In short, Aubrey Anna died from a lack of oxygen. *Id.* at 52. Her time of

---

[28] The medical malpractice in *Kelly* occurred before the statutory cap on non-economic damages took effect.

death was most likely when Tiara went into cardiac arrest in the helicopter, within 15 minutes of her arrival at UMC.[29]  *Id.*  The doctors at UMC delivered Aubrey Anna stillborn.  *Id.* at 50-51.

The defendant asserted that Aubrey Anna "just passed out, went to sleep" without pain or suffering.  Tr. 76, 325.  "In fact, . . . more than likely what she did was slowly become deprived of oxygen and just lose whatever consciousness she had.  There was no -- there was no impact, there was no prodding, no needlesticks, nothing.  She just lost oxygen and went to sleep."  *Id.* at 326.  The evidence, though, showed that a 30-week old fetus has well-developed reflexes and can respond to stimuli like touch.  *Id.* at 201, 204.  Dr. Elliott, meanwhile, testified that Aubrey Anna's heart rate increased as her body was stressed from a lack of oxygen.  PX-52, at 30-31.  Aubrey Anna's body responded to the lack of oxygen that was killing her by working harder and straining itself.  As she was dying, her body displayed its instinctive will to live.

The defendant's argument that Aubrey Anna merely "went to sleep" glosses over the medical reality that, to borrow defense counsel's own words, "more than likely what [Aubrey Anna] did was slowly become deprived of oxygen."  Tr. 326.  Another way to describe a deprivation of oxygen is "suffocation."  Webster's Third New International Dictionary (Unabridged) 2285 (1993) (defining suffocate as "to stop the respiration of (as by strangling or asphyxiation) : deprive of oxygen : make unable to breathe.").  Suffocation is obviously painful.

It is more likely than not that Aubrey Anna experienced physical pain and suffering before her death.  The Court will award $650,000 for that pain and suffering.

### 3.  Loss of Society and Companionship

Tiara's two surviving children, seven-year old Elona and five-year old Keontray, are entitled to damages for the loss of society and companionship of their mother.  The defendant argues that no such damages may be awarded because "Mississippi does not recognize damages for past and future loss of society and companionship for a child upon the loss of a parent."  Docket No. 61, at 8 (citing *Thompson v. Love*, 661 So. 2d 1131 (Miss. 1995)) (emphasis omitted).

*Thompson* was a personal injury case where the parent did not die.  In wrongful death cases like ours, though, children are permitted to recover loss of society and companionship damages for

---

[29]  These 15 minutes could easily have been made up for earlier.  Recall that Tiara had waited approximately 90 minutes in the Choctaw Health Center before Dr. Guevarra attempted to arrange a transfer to a better-equipped hospital.

the death of a parent. *Long v. McKinney*, 897 So. 2d 160, 169 (Miss. 2004) ("The beneficiaries are entitled to recover for their respective claims of loss of society and companionship."); *Thompson*, 661 So. 2d at 1136 (McRae, J., dissenting) (explaining difference between loss of companionship recovery in personal injury and wrongful death contexts); Jackson & Miller, 4 Encyclopedia of Mississippi Law § 25:18 (2001). Accordingly, Elona and Keontray will each be awarded $750,000 for the loss of society and companionship of their mother.

The plaintiff also seeks damages for Elona and Keontray's loss of society and companionship of their sister, Aubrey Anna. Such damages have long been permitted by the Mississippi Supreme Court. *E.g.*, *Miller*, 121 So. at 484 (observing that the decedent, a young boy, was "the pride of his father, the joy of his mother, the idol of his sisters, and the boon companion of his brothers"); *Gulf, M. & O.R. Co. v. White*, 68 So. 2d 458, 460 (1953) ("where the interested parties suing for the death of another are the brothers and sisters of the deceased, loss of companionship may be considered as an element of damages").

Here, the defendant's specific argument is that the claim fails because there was "no proof of any preexisting relationship between Aubrey Anna Clemons prior to her death and her siblings that could be characterized as affectionate or devoted." Docket No. 61, at 8. But, *of course* there was no preexisting relationship between Aubrey Anna and her siblings – she had not been born yet. The defendant deprived the siblings of the opportunity to form a relationship and do all the things that sisters and brothers do with each other, as well as experience the simple joys of life that siblings share.

The defendant's argument has not taken into account the Mississippi Legislature's decision in 2004 to amend the wrongful death statute to permit recovery for "the death of any person or of any unborn quick child." Miss. Code § 11-7-13 (emphasis added); *see* 2004 Miss. Laws Ch. 515 (H.B. 352). The amendment suggests that the legislature intended beneficiaries of unborn children who die a few weeks shy of birth to be treated akin to beneficiaries of children who die a few weeks after birth. A contrary interpretation would render meaningless the legislature's repeated addition of the phrase "unborn quick child" to the wrongful death statute. Aubrey Anna's siblings will each be awarded $400,000 for the loss of society and companionship of their sister.

Kathy Clemons has also lost the society and companionship of her daughter and granddaughter. She testified that when she arrived at UMC and was told that Tiara and Aubrey

Anna had died, it all went "blank." Tr. 169-71. "It's always cold and hard," she said. *Id.* at 171. "I wouldn't have ever thought I would lose my child like this." *Id.* Dr. Owens, who met with Kathy Clemons and her family at UMC to explain what had happened, reported that they were distraught and that not much registered. *Id.* at 198. "They were very clearly just emotionally devastated." *Id.*

On this basis, Kathy Clemons will be awarded $500,000 for the loss of society and companionship of her daughter Tiara and granddaughter Aubrey Anna. *See Gatlin v. Methodist Med. Ctr., Inc.*, 772 So. 2d 1023, 1030 (Miss. 2000).

### 4. Summary of Non-Economic Damages

The total award for non-economic damages is $5.45 million. Although this amount exceeds the economic damages award of $1,817,390, the ratio of economic damages to non-economic damages is well within acceptable boundaries.

> The Mississippi Supreme Court has upheld damages with far greater disparities than the award in this case. *Estate of Jones v. Phillips*, 992 So. 2d 1131, 1150 (¶ 52) (Miss. 2008) (upholding a $5,000,000 verdict and finding although economic damages only totaled $440,511.46, the amount of the verdict was not so excessive as to shock the conscience); *Gatewood v. Sampson*, 812 So. 2d 212, 223 (¶¶ 25-27) (Miss. 2002) (upholding jury verdict of $308,000 in compensatory damages although proof of lost wages and medical expenses only totaled $8,002.50); *Dorrough v. Wilkes*, 817 So. 2d 567, 575 (¶ 30) (Miss. 2002) (upholding jury verdict of $1,500,000 although medical fees and loss of services only totaled $339,000).

*Kelly*, 88 So. 3d at 780. The 2.99x multiple in our case is lower than the 10.3x, 37.5x, and 3.4x ratios affirmed above. *See id.*

### 5. Mississippi's Cap on Non-Economic Damages

In medical malpractice cases such as this, Mississippi law places a $500,000 ceiling on the recovery of non-economic damages. Miss. Code § 11-1-60(2)(a). The $500,000 cap applies to all plaintiffs together. *Estate of Klaus ex rel. Klaus v. Vicksburg Healthcare, LLC*, 972 So. 2d 555, 559 (Miss. 2007). In our case, that means Kathy Clemons and her grandchildren's total recovery for non-economic damages cannot exceed $500,000. *Id.* Given our facts, this amount is wholly inadequate and contrary to the evidence presented.

In 2011, the Fifth Circuit certified the question of a similar cap's constitutionality to the

Mississippi Supreme Court.[30] *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 739-40 (5th Cir. 2011). Unfortunately, the Mississippi Supreme Court declined to answer the certified question. *Sears Roebuck & Co. v. Learmonth*, 95 So. 3d 633 (Miss. 2012). The issue has now returned to the Fifth Circuit, which has ordered supplemental briefing.

Kathy Clemons has challenged the constitutionality of Mississippi's cap on non-economic damages in medical malpractice cases. Docket No. 56, at 17. The Court also finds it necessary to accept supplemental briefing on this issue. The parties are asked to respond to these three questions:

(1)     Does this Court have jurisdiction to make an *Erie*-guess as to the medical malpractice cap's constitutionality, when a nearly identical issue is pending before the Fifth Circuit?

(2)     If the Court does have jurisdiction, should it rule on the issue or await indefinitely the Fifth Circuit's decision?

(3)     Has the plaintiff's challenge been adequately preserved, considering the record, the trial proceedings, and the plaintiff's post-trial brief?

Responses are requested within 14 days and should be filed on the record.

6.      The FTCA's Administrative Limitation on Damages

Recall that before filing suit, plaintiff's counsel mailed the United States a thorough Notice of Claim and two completed SF-95s – one for Tiara and one for Aubrey Anna. PX-4. Each SF-95 sought $2.5 million in damages, for a total demand of $5 million. *Id.* The plaintiff's recovery in this case may not exceed that sum. 28 U.S.C. § 2675(b); *Corte-Real v. United States*, 949 F.2d 484, 487 (1st Cir. 1991) (collecting cases).

If Mississippi's cap on non-economic damages is upheld and applied, the plaintiff will recover less than $5 million, rendering the FTCA's limit moot. On the other hand, if Mississippi's cap is deemed unconstitutional, the FTCA's limit will be applied to cap the plaintiff's total recovery at $5 million.

*C.     Punitive Damages*

Punitive damages are not permitted under the FTCA. 28 U.S.C. § 2674. The plaintiff did not seek to recover them and the Court cannot award them. It will, though, observe that in addition

---

[30]  The precise issue before the Mississippi Supreme Court was the statutory cap applicable to non-medical malpractice cases, which is $1 million, *see Learmonth*, 631 F.3d at 740, but addressing that question would likely have affected the cap on medical malpractice recoveries as well.

to the evidence already described above, there is even more evidence that could have supported a finding of recklessness and an award of punitive damages. In other words, but for the fact that the government is the defendant, punitive damages would have been assessed.

One revealing piece of evidence is an April 17, 2009, letter from the Clinical Director of the Choctaw Health Center, Dr. C.V. Joshi, to the CEO of the Choctaw Health Center, in which Dr. Joshi warned the CEO about the Center's condition and urged improvements in the Center's care. PX-50 at 57-66 (deposition of Dr. Joshi); PX-17 (Dr. Joshi's letter). The letter's most salient points are reproduced here:

> WITH [BUDGETARY] CUTS IT IS NECESSARY TO TAKE [A] SECOND LOOK AT [THE] LEVEL OF CARE WE CAN OFFER. . . .
>
> In last 10-15 years Emergency medicine in it self has become a separate medical specility. These doctors are regorusly trained during their residency program in larger medical centers. These doctors are better equipped to handle critically ill patients' with heart attack, CVA; gun shot wounds and seriously hurt MVA patients. In order to stabilize critically ill ER patient some time availability of general surgeon, anesthesiologist, respiratory therapist, and internist with critical care experience and some time help of pediatrician is extremely necessary. . . .
>
> Emergency physicians at CHC are not full time ER physicians. Many of clinic physicians work part time in the emergency room. Even though these doctors take courses such as ACLS and PALS these courses and mock codes by no means substitute for day to day real life experience. . . .
>
> Our staff is mainly consists of family physicians. . . . We do not have surgeon, anesthetist, and internist with ICU/CCU experience or pediatrician on staff. There fore there is no immediate back up for the ER physician. . . .
>
> IN THE PAST I WAS ABLE TO EASE NEW PHYSICIAN AFTER SEVERAL MONTHS OF EXPOSURE TO UNDERSTAND OUR UNIQUE CULTURE, HEALTH PROBLEMS AND LIMITATIONS OF OUR FACILITY AND HOW TO PRACTICE SAFE MEDICINE IN HIGH RISK AREA SUCH AS EMERGENCY ROOM.
>
> IT IS TIME TO REEVALUATE OUR HEALTH DELIVERY SYSTEM AND MAKE GOVERNING BOARD AWARE ABOUT CHRONIC PRBLEMS
>
> AFTER NEXT FEW WEEKS I THINK GIVING ADEQUTE QUALITY COVERAGE IS ALMOST DIFFICULT.

PX-17, at 1-3. No immediate action was taken. PX-50, at 60. Just a few weeks later, of course, Tiara Clemons was treated at Choctaw Health Center by a family physician who refused to perform a basic procedure. In short, Tiara Clemons was treated by a family physician who had no right to be in an emergency room, but even worse, was in charge of the emergency room, and her superiors knew it. As a result, Tiara and her baby suffered the unalterable consequence.

Additional evidence not discussed may also have supported an award of punitive damages, from Dr. Guevarra not knowing where the chest tube was physically located, to the fact that medical equipment Tiara needed had been broken (for an indefinite period) when she needed it. PX-49, at 59, 66, 69-70.

The bottom line is that serious deficiencies with the care offered at the Choctaw Health Center were known and discussed months before Tiara and Aubrey Anna's disastrous visit (*e.g.*, Dr. Joshi's letter), or should have been addressed and resolved beforehand (*e.g.*, the lack of functioning ER equipment). Had prompt action been taken, their deaths may never have occurred. Every justification for awarding punitive damages is present in this case.

III.    *Conclusions of Law*

Although this is the unusual medical malpractice case where liability is not disputed, Rule 52 requires the Court to "state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Accordingly, the Court makes the following conclusions of law, which are derived in part from the parties' stipulations:

At all material times, Dr. Guevarra, Nurse Shaw, and all other individuals who provided medical care and treatment to Tiara and Aubrey Anna Clemons were acting in the course and scope of their employment with the Choctaw Health Center, a healthcare facility owned and operated by, and located on property occupied by, the Mississippi Band of Choctaw Indians, in Choctaw, Mississippi.

The United States is statutorily and at common law responsible for the wrongful and negligent acts with respect to Tiara Clemons and Aubrey Anna Clemons which occurred at the Choctaw Health Center.

As the sole wrongful death beneficiaries of Tiara and Aubrey Anna Clemons, deceased, Elona Clemons and Keontray Clemons, by and through Kathy Clemons and Bill Clemons, Guardians, are entitled to assert and prosecute a claim for damages arising out of the wrongful death

of Tiara and Aubrey Anna Clemons.

The care rendered to Tiara and Aubrey Anna Clemons on June 27, 2009, did not comply with, and fell below, the standard of care applicable to the Choctaw Health Center and Dr. Guevarra.

Dr. Guevarra and the Choctaw Health Center breached the applicable standard of care while rendering medical care and treatment to Tiara and Aubrey Anna Clemons. The breach of the standard of care included a failure to timely transfer Tiara and Aubrey Anna to a healthcare facility with additional treatment capabilities, and/or failing to insert a chest tube, *i.e.*, perform a thoracostomy, to protect Tiara Clemons' airway.

Had Tiara and Aubrey Anna Clemons received treatment at the Choctaw Health Center consistent with the applicable standard of care, *i.e.*, timely transfer to a healthcare facility with additional treatment options available and/or insertion of a chest tube, both Tiara and Aubrey Anna Clemons would have survived intact.

The breaches of the standard of care of Dr. Guevarra and the Choctaw Health Center while rendering medical care and treatment to Tiara Clemons and Aubrey Anna Clemons were a proximate cause of the deaths of Tiara Clemons and Aubrey Anna Clemons.

Pursuant to Mississippi Code § 85-5-7, no fault or responsibility for the death of Tiara or Aubrey Anna Clemons can be apportioned or assigned to Marena Clemons or any other intentional tortfeasor for purposes of reducing or mitigating liability attributable to the United States for the deaths, or damages owed by the United States to the wrongful death beneficiaries.[31]

With respect to the claims for the wrongful deaths of Tiara and Aubrey Anna Clemons, proper Notices of Claim have been provided to the United States pursuant to 28 U.S.C. § 1346(b) and/or 42 U.S.C. § 233 (FTCA); all administrative remedies have been exhausted by the plaintiff; and all conditions precedent to entry of judgment in favor of Plaintiffs have been satisfied.

As a result of the defendant's breaches causing the deaths of Tiara and Aubrey Anna Clemons, the plaintiff is entitled to judgment against the defendant in the amount of $1,817,390 in economic damages, in addition to non-economic damages to be determined after supplemental briefing, but in any event no less than $500,000.

---

[31] *See also* Tr. 216-17.

*IV.*     *Order*

      For the foregoing reasons, the Court finds in favor of plaintiff Kathy Clemons in the amount of $1,817,390 in economic damages and at least $500,000 in non-economic damages. The parties' supplemental briefs on the constitutionality of Mississippi's medical malpractice damages cap shall be filed within 14 days.

      **SO ORDERED**, this the 30th day of October, 2012.

                      s/ Carlton W. Reeves
                      UNITED STATES DISTRICT JUDGE