**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

| | |
|---|---|
| **KATHY CLEMONS,** *individually; as guardian of Elona Clemons, a minor, and Keontray Clemons, a minor; and on behalf of all wrongful death beneficiaries of Tiara Renea Clemons, deceased, and Aubrey Anna Clemons, deceased.* | **PLAINTIFF** |
| **v.** | **CAUSE NO. 4:10-CV-209-CWR-FKB** *consolidated with* **CAUSE NO. 4:10-CV-210-CWR-FKB** |
| **UNITED STATES OF AMERICA** | **DEFENDANT** |
| **and** | |
| **STATE OF MISSISSIPPI** | **INTERVENOR** |

<u>**ORDER**</u>

Before the Court is the plaintiff's memorandum of law challenging the constitutionality of Mississippi Code § 11-1-60(2)(a), a statute which limits the recovery of non-economic damages in medical negligence cases. Docket No. 69. The defendant has responded in opposition, Docket No. 71, the State of Mississippi has intervened to defend the statute, Docket No. 73, and the plaintiff has filed her rebuttal, Docket No. 74.

After reviewing the facts, arguments, and applicable law, the Court concludes that (1) the defendant has not waived application of the statutory limitation, and (2) the Mississippi Supreme Court would likely conclude that the statute is constitutional.

**I.     Background**

This Court previously issued a lengthy memorandum opinion resolving all of the contested issues of fact and most of the contested issues of law in this matter. *See* Docket No. 62. To summarize, this is a medical negligence case where an emergency room physician employed by the United States of America refused to provide basic medical treatment to Tiara Clemons and her unborn, 30-week-old child Aubrey Anna, causing their deaths. *Id.* at 1. Acknowledging that there was no excuse for the doctor's staggering incompetence, the defendant admitted liability and the case proceeded to a bench trial on damages only. *Id.*

The evidence at trial supported an award of economic damages in the amount of approximately $1.8 million, as well as an award of non-economic damages in the amount of $5.45 million. *Id.* at 21. The latter award was grounded in the "evidence show[ing] that Tiara suffered tremendously, both physically and mentally, before dying"; that Aubrey Anna had suffocated to death in the womb; that plaintiff Kathy Clemons had forever lost the company of her daughter and her granddaughter; and that minor children Elona and Keontray Clemons had forever lost the comfort of their mother and sister. *See id.* at 17-21. The Clemons family suffered a profound loss, the depths of which are unknowable and uniquely unfathomable. A greater horror could not be written by Stephen King or scripted by Clive Barker.

The defendant now seeks to reduce the $5.45 million non-economic damages award to $1 million pursuant to Mississippi Code § 11-1-60(2)(a). That law caps a plaintiff's recovery of non-economic damages in a medical negligence case at $500,000 per decedent. *See* Docket No. 75.

The plaintiff argues that the full $5.45 million should be awarded because the defendant has waived the protection of § 11-1-60(2)(a).[1] Docket No. 69, at 10-16. In the alternative, she argues that the statute violates the Mississippi Constitution's prohibition on "special legislation" and the United States Constitution's Fifth and Fourteenth Amendments. *Id.* at 42-57. The defendant's response brief argues against waiver, Docket No. 71, while the State's response brief defends the constitutionality of the statute, Docket No. 73.

After the briefing was completed, the Fifth Circuit issued an opinion concluding that § 11-1-60(2)(*b*), which caps non-economic damages in *non*-medical malpractice cases at $1 million, does not violate Mississippi's jury trial guarantee and separation of powers provisions. *Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249 (5th Cir. 2013).

Although this case involves a different paragraph in the statute, the Fifth Circuit's reasoning in *Learmonth* applies here with equal force, such that the plaintiff's jury trial guarantee and separation of powers arguments need not be considered anew.[2] That is because Fifth Circuit decisions interpreting Mississippi law are binding upon this Court until the Mississippi Supreme

---

[1] If successful, the plaintiff would not actually recover that amount. She has limited her recovery to a total of $5 million – including both economic and non-economic damages – because that was the total sum she demanded in her Federal Tort Claims Act Notices of Claim. *See* Docket No. 62, at 22.

[2] The plaintiff has preserved these arguments for further review.

Court declares otherwise. If the Mississippi Supreme Court chooses to finally take up this issue, that body may decide for itself whether Mississippi belongs with those states that have struck down similar caps or those states that have affirmed similar caps. *See Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633, 640-41, 650-52 (Mo. 2012) (collecting various state supreme court decisions on both sides of the issue); *see also* David F. Maron, *Statutory Damage Caps: Analysis of the Scope of Right to Jury Trial and the Constitutionality of Mississippi Statutory Caps on Noneconomic Damages*, 32 Miss. C. L. Rev. __ (forthcoming 2013) ("In all, some thirty-nine states enacted caps on noneconomic damages. In nineteen states, courts have upheld the statutes; courts in nine states have struck them down, and eleven states have statutory caps that have never been challenged. Of those eleven, two have statutes which were previously struck down but then reenacted.").

## II.    Legal Standard

The Federal Tort Claims Act (FTCA) "requires the Government's liability to be measured in accordance with the law of the state where the alleged act or omission occurred." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Miss. Plaintiffs)*, 668 F.3d 281, 287 (5th Cir. 2012) (citations omitted). The tortious acts and omissions in this case occurred in Mississippi. Accordingly, this Court applies Mississippi substantive law and federal procedure. *See Johnston v. United States*, 85 F.3d 217, 219 (5th Cir. 1996). Although there is no dispute between the parties on this point, the Court notes that state law damages caps apply in FTCA cases. *See Richards v. United States*, 369 U.S. 1, 3, 11-16 (1962) (holding that the forum state's whole law applies, including its choice of law rules and statutory damages caps); s*ee also Estate of McCall v. United States*, 663 F. Supp. 2d 1276, 1294-95 (N.D. Fla. 2009).

The Mississippi Supreme Court applies the following legal standard when it reviews the constitutionality of a state statute:

> In considering the constitutionality of a legislative enactment, this Court recognizes that duly enacted statutes and laws have a strong presumption of constitutionality, and that the party challenging the constitutionality of a law must prove beyond a reasonable doubt that the law is in palpable conflict with some plain provision of the constitution. This Court will invalidate a statute on constitutional grounds only where it appears beyond all reasonable doubt that such statute violates the constitution.

*Oxford Asset Partners, LLC v. City of Oxford*, 970 So. 2d 116, 120 (Miss. 2007) (quotation marks and citations omitted).

"In making an *Erie*-guess in the absence of explicit guidance from the state courts, [this Court] must attempt to predict state law, not to create or modify it." *Learmonth*, 710 F.3d at 258 (quotation marks and citation omitted). Federal courts proceed cautiously, cognizant of the Supreme Court's reminder that "when a federal decision on state law is obtained, the federal court's construction often is uncertain and ephemeral." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 122 n.32 (1984).

## III.     Discussion

### A.     Waiver

In the Fifth Circuit, a state law limiting the recovery of non-economic damages in a medical negligence case is considered to be an affirmative defense under Federal Rule of Civil Procedure 8(c). *Simon v. United States*, 891 F.2d 1154, 1156-57 (5th Cir. 1990) (collecting cases). As a general matter, a party has waived an affirmative defense when it fails to plead the defense "in its first responsive pleading." *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 860 (5th Cir. 2000) (citation omitted). That rule operates to give the plaintiff notice and an opportunity to respond to the defenses the defendant has asserted. *See Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 467 (5th Cir. 2001).

When a defendant fails to raise an affirmative defense in its first responsive pleading, that "technical failure to comply precisely with Rule 8(c) is not fatal" where the defense is later raised "in a manner that does not result in unfair surprise." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009) (quotation marks and citation omitted). "An affirmative defense is not waived if the defendant raised the issue at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond." *Id.* (quotation marks, citation, and brackets omitted).

The Court now examines the procedural history of this case to see when and how the affirmative defense of § 11-1-60(2)(a) was raised.

Prior to filing suit, the plaintiff mailed the United States government proper Notices of Claim seeking $2.5 million for each wrongful death, for a total of $5 million. Docket No. 62, at 22. The claims were not resolved during the administrative process, so she filed suit in this Court, again seeking a total of $5 million.[3] Docket No. 1, at 9. Copies of the Notices of Claim were attached to

---

[3] One complaint was filed for each decedent, and the government filed one answer in each case, but that is not relevant to this discussion.

her complaint. *Id.* at 10-22.

In its answer, the defendant acknowledged that "Plaintiff[] filed two Administrative Tort Claims and that neither claim was resolved within six months from the date of filing." Docket No. 7, at 2. Thus, the defendant was aware of the amount of the plaintiff's demand. But its answer did not mention or invoke § 11-1-60(2)(a). Discovery ensued and the dispositive motion deadline passed.

Section § 11-1-60(2)(a) was not raised by either party until the day before trial, when the plaintiff filed proposed findings of fact and conclusions of law arguing that § 11-1-60 was "inapplicable," "unconstitutional," and "unenforceable." Docket No. 52, at 11.

The statute was also mentioned in the parties' final proposed Pretrial Order.[4] In that document, under a section entitled "CONTESTED ISSUES OF LAW," the parties presented the following issue: "Whether, and if so, to what extent, MISS. CODE ANN. § 11-1-60 (1972) is applicable as a constitutionally permissible limitation on non-economic damages, if any, to which the wrongful death beneficiaries of Tiara Clemons and Aubrey Anna Clemons may be otherwise entitled." Docket No. 56, at 17. The Pretrial Order was accepted by the undersigned the morning of trial. *Id.* at 23. Pursuant to paragraph three of that document, "[t]he pleadings [were] amended to conform to this Pre-trial Order." *Id.* at 2.

After trial, the Court's memorandum opinion asked the parties for supplemental briefing on several questions pertaining to § 11-1-60(2)(a). *Id.* at 22. One of those questions was whether "the plaintiff's challenge [to the constitutionality of § 11-1-60(2)(a) has] been adequately preserved, considering the record, the trial proceedings, and the plaintiff's post-trial brief." *Id.*

Nine days later, the plaintiff filed a formal "Notice of Constitutional Question" alerting the Attorney General of Mississippi that she was challenging § 11-1-60. Docket No. 63. The document was filed in accordance with 28 U.S.C. § 2403 and Federal Rule of Civil Procedure 5.1. *Id.* The Court also entered its own Certification pursuant to those authorities. Docket No. 68. The plaintiff and the Court served the Attorney General with their respective documents shortly thereafter. The process concluded with the Attorney General's Office intervening and filing its brief on § 11-1-

---

[4] Section 11-1-60 was not mentioned in the parties' first draft Pretrial Order, which was submitted to the Court on April 4, 2012, approximately one month before trial.

60(2)(a). Docket Nos. 70, 73.

The plaintiff's argument is that the defendant's failure to invoke § 11-1-60 in its answer when it knew it was facing a $5 million demand necessarily results in waiver of the statute's benefits. Docket No. 69, at 11. The fact that § 11-1-60 was listed in the Pretrial Order as a contested issue of law was too late, she says. *Id.* at 15-16.

It is true that when the United States was confronted with this $5 million demand arising from two wrongful deaths, the best practice would have been to plead the limitation contained in § 11-1-60(2)(a). That is because the total economic damages incurred by Tiara and Aubrey Anna Clemons probably would not have approached $4 million, leaving more than $1 million to go before reaching the plaintiff's (self-imposed) $5 million FTCA ceiling.[5] In other words, from the beginning, the size of the plaintiff's demand meant she was most likely seeking more than $500,000 in non-economic damages per decedent, an amount that would exceed the statutory cap. That should have been enough to place the United States on notice that § 11-1-60(2)(a) had to be raised as an affirmative defense.

Being placed on notice, however, is not necessarily dispositive of waiver. That will be explained below.

The plaintiff has analogized her situation to *Simon v. United States*. In that case, the defendant claimed to have raised three times a Louisiana statute capping damages in medical negligence cases: (1) once in a motion for summary judgment filed four months before trial; (2) again in the Pretrial Order; and (3) finally in a Rule 59(e) motion to alter or amend the judgment. *Simon*, 891 F.2d at 1157-59.

On appeal, the first two invocations were found to be inadequate. The Louisiana statute "had no bearing" on the motion for summary judgment, and therefore "was not sufficient to give notice to the remaining plaintiff or the court that the government . . . intended to claim the benefit of the statutory limitation to limit its liability to $500,000." *Id.* at 1158. And the statement in the Pretrial Order that "Louisiana law applies" was too general to put the plaintiff and the Court on notice of the statutory cap. *Id.*

_____

[5] In fact, the total economic damages in this case did not even reach $2 million, leaving over $3 million in non-economic damages at play.

It took more ink to explain why the defendant's Rule 59(e) motion also was inadequate. The Fifth Circuit explained that the Louisiana statute required a health care provider to file a form with the Louisiana insurance commissioner, as well as pay a surcharge, before the provider could take advantage of the statutory cap. *Id.* at 1158 n.3. Apparently these were facts appropriate to prove at trial or by stipulation. *Id.* at 1158-59.

The defendant in *Simon*, however, had not proved these requirements at trial. *Id.* at 1158. And a post-trial motion was too late to attempt to prove up factual contentions; that window had passed. As the court explained, "[t]he applicability of the Louisiana statute involves more than just a pure issue of law and, as we have already noted, had the issue been raised prior to trial, or during the trial, it would have been a major issue, indeed perhaps the predominant issue, and the character of the trial would have been different."[6] *Id.* at 1159.

The Fifth Circuit concluded that the defendant had waived its affirmative defense and affirmed the judgment in full against the United States. *Id.* at 1159-60.

There are obvious similarities between *Simon* and the present case. Both are FTCA actions against the United States where medical negligence caused a wrongful death. In both cases, the United States admitted liability and proceeded to trial on damages only. And, most importantly, in both cases the United States failed to plead a state law limitation on damages in its answer.

But that is where the similarities end. In this case, the parties introduced a sentence into the Pretrial Order which specifically preserved § 11-1-60(2)(a) as an unresolved issue of law. Per *Simon*, that gave "the district judge and [the plaintiff] . . . every right to assume that the United States did . . . intend to claim the benefit of the statutory limitation on liability." *Id.* at 1158.

It also is relevant that Mississippi's statutory cap on non-economic damages requires no factual prerequisite to be proven at trial; as the parties effectively conceded in the Pretrial Order, it may be applied as a matter of law. It may be possible, then, for a defendant to fail to invoke the statute before trial and raise it via post-trial motion with success, as long as "the defendant raised the issue at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to

---

[6] For example, constitutional challenges in Louisiana require the statute's defender to prove "that the legislative classification substantially furthers a legitimate state purpose." *Simon*, 891 F.2d at 1159. The defendant's failure to introduce facts on that issue at trial meant it could not defend the constitutionality of the limitation on damages.

respond." *Knoblauch*, 566 F.3d at 577 (quotation marks, citation, and brackets omitted).

Today's case is most similar to *Lucas v. United States*, 807 F.2d 414 (5th Cir. 1986). There, the defendant preserved Texas's limitation on medical negligence damages awards by raising the issue "at trial immediately following testimony of the economist" testifying to the plaintiff's damages. *Id.* at 418. The Fifth Circuit added that "the applicability of the Texas statutory cap on malpractice damages is purely a legal issue which can be resolved without the need for factual proof." *Id.* Thus, the plaintiff was not prejudiced by the defendant raising the issue during trial.

This case is too similar to *Lucas* to warrant a different outcome. Although Mississippi's cap on non-economic damages was not raised in the defendant's answer, it was preserved by its specific inclusion in the Pretrial Order. As a result, the defendant has not waived this affirmative defense.

### B. The Merits

#### 1. Special Legislation

Recall that § 11-1-60 limits awards of non-economic damages in two ways. Paragraph (2)(a) states that plaintiffs who bring claims "for injury based on malpractice or breach of standard of care against a provider of health care, including institutions for the aged or infirm," can recover no more than $500,000 in non-economic damages. Miss. Code § 11-1-60(2)(a). That is the section at issue in this case.

In contrast, paragraph (2)(b) states that plaintiffs in any *other* civil action can recover no more than $1 million in non-economic damages. *Id.* § 11-1-60(2)(b). Thus, a plaintiff suing a doctor for injuries caused by medical negligence can recover up to $500,000 in non-economic damages, while the same plaintiff suing that same doctor for injures caused by a vehicular accident can recover up to twice as much in non-economic damages.[7]

The plaintiff argues that § 11-1-60(2)(a)'s extra benefit to health care providers violates the

---

[7] This example illustrates that it is not the identity of the defendant that matters to the maximum amount of non-economic damages, but instead how the plaintiff's injury was caused. A second illustration demonstrates the point as well: emergency medical personnel who are dispatched via ambulance and provide negligent medical care to a person are subject to the $500,000 cap. But those same providers who injure a person through the negligent driving of the ambulance may be held liable for up to $1,000,000 in non-economic damages.

It is not immediately obvious why that distinction is relevant to an award of non-economic damages: how do you compare pain and suffering incurred by a medical error to pain and suffering incurred by a car accident? In both cases you have an injured plaintiff, a responsible medical provider (either acting as physician/EMT or driver), and a certain amount of suffering. The difference is the party ultimately responsible for payment of the non-economic damages: a medical liability insurance company in one instance, and a car insurance company in the other.

Mississippi Constitution's prohibition on "special legislation." Docket No. 69, at 42-49. The distinction is discriminatory in two ways, she says: (1) health care providers are favored over and above all other defendants, and (2) patients who suffer at the hands of health care providers can receive awards of only half as much as persons injured in other ways. *Id.* "The effect of the statute is that those medical negligence plaintiffs with less severe injuries receive full compensation for their injury and damage, while the most severely injured medical negligence plaintiffs are denied full recovery," she contends. *Id.* at 42. With this argument, the plaintiff seeks to void the $500,000 "special" cap and have the $1 million "general" cap applied to this action. *Id.* at 44.

> Section 87 of the Mississippi Constitution provides that:

> No special or local law shall be enacted for the benefit of individuals or corporations, in cases which are or can be provided for by general law, or where the relief sought can be given by any court of this state; nor shall the operation of any general law be suspended by the legislature for the benefit of any individual or private corporation or association, and in all cases where a general law can be made applicable, and would be advantageous, no special law shall be enacted.

Miss. Const. art. IV, § 87. Another section in the state Constitution provides that "[t]he legislature shall not pass local, private, or special laws in any of the following enumerated cases, but such matters shall be provided for only by general laws, viz.: . . . Regulating the practice in courts of justice." *Id.* § 90(s).

"The purpose of such provisions is to confine the power of the legislature to the enactment of general statutes conducive to the welfare of the state as a whole, to prevent diversity of laws on the same subject, to secure uniformity of law throughout the state as far as possible, and to prevent the granting of special privileges." *Smith v. Transcon. Gas Pipeline Corp.*, 310 So. 2d 281, 282 (Miss. 1975) (citation omitted). Section 87 in particular "has been held repeatedly to apply only where there has been a local or private law enacted for the benefit of 'private individuals or corporations.'" *Brandon v. City of Hattiesburg*, 493 So. 2d 324, 326 (Miss. 1986) (citation omitted).

"A law is classified as general when it operates uniformly on all members of a class of persons, places or things requiring legislation peculiar to that class." *Sec'y of State v. Wiesenberg*, 633 So. 2d 983, 995 (Miss. 1994); *see City of Canton v. Nissan N. Am., Inc.*, 870 F. Supp. 2d 430, 438 (S.D. Miss. 2012) (finding Miss. Code § 21-1-59(2) to be a general law). For example, while "the legislature has as its prerogative the power to control the substantive law applicable to liability

in tort for negligence," that does not "mean that the consequent statutes may effectuate this purpose *with an uneven hand.*" *Rolph v. Bd. of Trustees of Forrest Cnty. Gen. Hosp.*, 346 So. 2d 377, 379 (Miss. 1977) (emphasis added), *overruled on other grounds by Pruett v. City of Rosedale*, 421 So. 2d 1046 (Miss. 1982).

Although § 11-1-60(2)(a) does not mention a particular person or corporation, the plaintiff's supporting sources discuss how special legislation prohibitions were designed to curb grant of "legislative favors" to "powerful interest groups." Docket No. 69, at 43 (citation omitted). This suggests that at heart, her argument is that doctors, hospitals, nursing homes, and their insurers are a powerful interest group that persuaded the legislature to pass a law twice as favorable to them as other potential defendants and their respective insurance companies, at the expense of patients who have been victims of malpractice.

Even assuming the truth of her critique, decisions from Mississippi's highest court suggest that § 11-1-60(2)(a) would violate this clause of the Mississippi Constitution only if it were written more narrowly. In *Smith*, for example, the Mississippi Supreme Court struck down a law excluding Jones County and only Jones County from its terms. *Smith*, 310 So. 2d at 284. In *Oxford Asset Partners*, that court struck down part of a law that excluded the City of Oxford and only that City from the general law of Mississippi. *Oxford Asset Partners*, 970 So. 2d at 119. Other examples confirm the trend. *See State ex rel. Pair v. Burroughs*, 487 So. 2d 220, 225 (Miss. 1986) (voiding law applicable to Jones County only); *Rolph*, 346 So. 2d at 379 (voiding law applicable to Forrest County only). The specificity need not be geographic; a law targeting a particular corporation also can be declared void under this constitutional provision. *See State v. Mobile, J. & K.C.R. Co.*, 38 So. 732, 737 (Miss. 1905) (finding that "an express grant of power by the Legislature for the two [railroad] companies to consolidate . . . would have been void" under Section 87 of the state Constitution).

Here, the special interest group benefitting from § 11-1-60(2)(a) is an entire industry, not a specific person, corporation, partnership, or association. The statute applies to all health care providers across the State on equal terms. *See Wiesenberg*, 633 So. 2d at 995 ("The present legislation is neither local nor private, nor does it benefit one owner over another with a planned or intentional bias. . . . Because the tidelands legislation will be applied to all members of the class of persons whose lands border tidelands, it constitutes a general law."). Under Mississippi law, then,

it is more akin to a general law than special legislation, and survives this constitutional challenge.[8]

The plaintiff's argument on § 90 of the Mississippi Constitution, regarding differential treatment of health care providers "in courts of justice," fails for the same reason. Even if several other states have ruled on similar grounds, the plaintiff has not pointed to Mississippi case law indicating that § 90 would be more favorably interpreted than § 87.[9]

For these reasons, this constitutional challenge will be denied.

## 2. Substantive Due Process and Equal Protection

The plaintiff's next argument is that "§ 11-1-60's disparate treatment of both medical negligence plaintiffs and tortfeasors other than healthcare providers violates the equal protection clause of the Fourteenth Amendment, and substantive due process guarantees of the United States Constitution." Docket No. 69, at 50. She relies upon an Alabama Supreme Court decision which concluded that an Alabama statute limiting recovery in medical malpractice cases "not only creates a favored class of tort-feasors, based solely upon their connection with health care, but also creates favored subclasses within the favored class by shielding those health care providers whose actions are the most egregious," and "creates classifications based upon the severity of the [plaintiff's] injury." *Id.* (quoting *Moore v. Mobile Infirmary Ass'n*, 592 So. 2d 156, 166-67 (Ala. 1991)).

"The Equal Protection Clause commands that no person shall be denied equal protection of the law by any State." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 510 (5th Cir. 2001) (citation omitted). "The equal protection guarantee applies to all government actions which classify

---

[8] For an example of why § 11-1-60(2)(a) is likely to be deemed a general law, consider the statutes limiting the practice of law in Mississippi to those persons who have been admitted to the Mississippi bar or are admitted to a particular court *pro hac vice*. *E.g.*, Miss. Code § 73-3-55 ("It shall be unlawful for any person to engage in the practice of law in this state who has not been licensed according to law."). Those laws discriminate in favor of licensed attorneys by conferring special privileges upon that group. They also discriminate against lawyers not admitted to the Mississippi bar and non-lawyers.

Those laws are not unconstitutional, though, because the legislature is entitled to pass general laws regulating the *industry* of the legal profession, pursuant to its ultimate interests in consumer protection. *See Darby v. Miss. State Bd. of Bar Admissions*, 185 So. 2d 684, 687 (Miss. 1966) ("the prohibition against others than members of the bar of the State of Mississippi from engaging in the practice of law is not for the protection of the lawyer against lay competition, but is for the protection of the public"). In other words, while a statute regulating a specific law firm or the practice of a particular attorney would be void, general limitations on the practice of law do not violate Section 87 of the Mississippi Constitution. Section § 11-1-60(2)(a) is general enough to warrant the same outcome.

[9] The plaintiff's argument on § 90 may also be controlled by the Fifth Circuit's reasoning in *Learmonth* denying a separation of powers clause challenge to § 11-1-60.

individuals for different benefits or burdens under the law." *Id.* (citation omitted).

The plaintiff argues that strict scrutiny should be applied to § 11-1-60(2)(a) because she was not provided a jury trial. Docket No. 69, at 26. "Equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar [dis]advantage of a suspect class." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 211 (5th Cir. 2012) (quotation marks and citation omitted) [hereinafter *NRA*].[10]

Although it is true that the FTCA does not provide for jury trials, *see* 28 U.S.C. § 2402, the cases the plaintiff has cited do not show a connection between that fact and strict scrutiny review of her constitutional claims. *See Miss. Comm'n on Judicial Performance v. Wilkerson*, 876 So. 2d 1006, 1011 (Miss. 2004) (applying strict scrutiny "[w]here the government seeks to restrain political/public issue speech"); *Associated Press v. Bost*, 656 So. 2d 113, 117 (Miss. 1995) (applying rational basis review after finding no "fundamental right to broadcast from the courtroom"); *Doe v. Doe*, 644 So. 2d 1199, 1209-10 (Miss. 1994) (finding, "[i]n child custody cases where it is alleged that one parent has sexually abused their child," that the accused parent has a fundamental right to confront witnesses against him or her, and therefore applying strict scrutiny to "any attempt to abridge this fundamental right"); *Thompson v. First Miss. Nat'l Bank & Mut. Sav. Life Ins. Co.*, 427 So. 2d 973, 976 (Miss. 1983) ("The circuit courts of this state should give strict scrutiny to a transfer movant's denomination of a claim as one involving a complicated accounting.").

Because the plaintiff has not shown how § 11-1-60(2)(a) interferes with her fundamental rights or disadvantages a suspect class, rational basis review applies. *See Ford Motor Co.*, 264 F.3d at 510; *accord Wells v. Panola Cnty. Bd. of Educ.*, 645 So. 2d 883, 896 (Miss. 1994) ("Parties injured by government tortfeasors, or by any tortfeasors, are not a 'suspect class.'").

"When conducting rational basis review, a court will not overturn the legislation unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational." *NRA*, 700 F.3d at 212 (quotation marks, citation, and brackets omitted). The Mississippi

---

[10] While *NRA* says strict scrutiny applies to classifications that operate "to the peculiar *advantage* of a suspect class," its supporting citation says strict scrutiny applies to classifications that operate "to the peculiar *disadvantage* of a suspect class." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (emphasis added).

Supreme Court has also recognized that "laws will not be invalidated under the due process or equal protection clauses unless they are manifestly arbitrary or unreasonable for the classifications." *Miss. Bd. of Nursing v. Belk*, 481 So. 2d 826, 830 (Miss. 1985) (citations omitted) (invalidating under the equal protection clause a grandfather clause regulating nurses). "[A]lthough rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) (citation omitted).

There are two preliminary concerns with the plaintiff's argument. First, the Alabama decision she relies upon invalidated that state's non-economic damages limitation under *Alabama's* equal protection guarantee, not the Fourteenth Amendment to the United States Constitution. The Alabama Supreme Court recognized that the standard of review it applied "may, in fact, provide more protection for private rights than the United States Constitution requires." *Moore*, 592 So. 2d at 170 (citations omitted).

Second, that court found Alabama's statute unconstitutional after considering studies calling into question the purported correlation between a limitation on non-economic damages in medical malpractice cases and a reduction in medical malpractice insurance premiums. *Id.* at 166-69. The Alabama Supreme Court found that the legislature's mere belief that a cap on non-economic damages would reduce medical malpractice premiums did not justify the law's actual and substantial burdens on severely injured plaintiffs. *Id.* at 168-69.

Those factors present a challenge for the plaintiff. The main case she relies upon hinges on a different state court interpreting a different constitution; unlike Alabama, Mississippi's constitution has no equal protection clause. And she has not presented any evidence about the relationship between caps on non-economic damages and medical malpractice insurance premiums, even assuming that evidence would be relevant. All we have is argument.

The lack of direct precedent or evidence is problematic, because with argument alone it is easy to assert that the Mississippi legislature could rationally have believed that reducing the amount of non-economic damages assessed against health care providers would have a beneficial effect on insurance premiums for those providers. Others may find that logic *irrational* and disagree, of course. *See generally* R. Jason Richards, *Capping Non-Economic Medical Malpractice Damages: How the Florida Supreme Court Should Decide the Issue*, 42 Stetson L. Rev. 113, 135-36 (2012)

(explaining a number of alternate ways in which the legislature could address the rise in medical malpractice insurance premiums, and arguing that "the ideal way to deal with the problem of increasing insurance costs is to eliminate the conditions that lead to medical malpractice") (quotation marks and citation omitted); Alan G. Williams, *The Cure for What Ails: A Realistic Remedy for the Medical Malpractice "Crisis,"* 23 Stan. L. & Pol'y Rev. 477, 495-96 (2012) (contending that damages caps "have had little effect on medical malpractice insurance premiums" and arguing that the "gaping hole in any argument for non-economic damages caps is the case resulting in a low economic damages award yet the true 'pain and suffering' loss is significant: the death of a child") (citations omitted); Geoff Boehm, *Debunking Medical Malpractice Myths: Unraveling the False Premises Behind "Tort Reform,"* 5 Yale J. Health Pol'y L. & Ethics 357, 363-69 (2005) (arguing that caps do little to address the rising costs of health care and medical malpractice insurance and that one way to address those concerns is to have "stronger regulation of the insurance industry"). But the Mississippi Legislature's choice is not "manifestly arbitrary or unreasonable." *Belk*, 481 So. 2d at 830; *see also Murphy v. Edmonds*, 601 A.2d 102, 114-15 (Md. 1992) (declining to invalidate Maryland's cap on non-economic damages in light of a legislative record showing that the cap was "enacted in response to a legislatively perceived crisis concerning the availability and cost of liability insurance in this State. . . . The crisis also affected the medical profession, resulting in excessive insurance premiums for doctors and declining services for patients, especially in high risk specialties such as obstetrics.").

In addition, the fact that § 11-1-60(2) creates distinctions between two types of defendants, and also leaves more seriously-injured plaintiffs without their full measure of non-economic damages while other plaintiffs are made whole, most likely would not meet the Mississippi Supreme Court's high standard for a constitutional violation.

In *Nosser v. Natchez Jitney Jungle, Inc.*, 511 So. 2d 141 (Miss. 1987), for example, the Mississippi Supreme Court quoted and endorsed the United States Supreme Court's holding that:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations – illogical, it may be, and unscientific. A statutory discrimination will not be set aside if any state

of facts reasonably may be conceived to justify it.

*Id.* at 143 (quotation marks and citations omitted). In that case, the court affirmed under rational basis review the legislature's decision to deny worker's compensation benefits to a claimant's non-dependent heirs. *Id.* at 144.

The Mississippi Supreme Court has also rejected an equal protection challenge to a state statute capping the recovery of damages caused by public school bus drivers at $10,000. *Wells*, 645 So. 2d at 896-97. It wrote that "[c]lassifications distinguishing among types of tort victims have been upheld in other jurisdictions," and concluded that such classifications were not unconstitutional in that instance because "protecting the public treasury is a legitimate legislative purpose," and "limiting damages recoverable from the State for school bus accidents is rationally related to the achievement of that goal."[11] *Id.* at 897. Although that law made whole those plaintiffs with lesser injuries, and left seriously-injured plaintiffs without their full measure of damages, it was upheld.

In light of these cases, the Mississippi Supreme Court would likely hold that an effort to reduce medical malpractice insurance premiums is a legitimate legislative purpose and that the limitation of health care providers' non-economic damages to $500,000 was rationally related to achieving that goal, even though the statute without question creates significantly imperfect and unequal classifications.

It also can be argued that the legislature's decision to favor health care providers is a simple exercise in providing economic protection to the health care insurance industry over and above that protection provided to the rest of the insurance industry. Under the United States Constitution, "protecting or favoring a particular intrastate industry is not an illegitimate interest when protection of the industry can be linked to advancement of the public interest or general welfare." *St. Joseph Abbey*, 712 F.3d at 222 (emphasis omitted). If the legislature believed that lower insurance premiums would encourage greater access to health care and advance the general welfare, the economic protection would survive constitutional review.

---

[11] The plaintiff objects to relying on *Wells* because much of that case focused on sovereign immunity and the protection of the public treasury. Docket No. 74, at 5. The plaintiff's objection is well-taken, but *Wells* is likely a reliable indication of how the Mississippi Supreme Court would consider the plaintiff's constitutional challenge of the legislature's evident desire to give more protection to the health care industry than to other industries which contribute to the state's economy, notwithstanding the sovereign immunity feature of that case.

For these reasons, this portion of the plaintiff's constitutional challenge is denied.

\* \* \*

This Court has sought to faithfully interpret and apply the decisions of the Mississippi Supreme Court to this matter, and believes it has done so in resolving the plaintiff's equal protection challenge. As technical as that discussion can be, though, the undersigned has not forgotten the persons at the heart of this tragic case: Tiara, Aubrey Anna, Kathy, Elona, and Keontray Clemons, and their other family members.

In recognition of their situation, and in the interests of fidelity to the facts, the Court will take a moment to explain just how discriminatory the application of the statutory cap is in this case. The evidence shows that Kathy, Elona, and Keontray Clemons are indisputably being shortchanged by Mississippi's civil justice system.

The legislature declared non-economic damages like pain, suffering, emotional distress, and loss of society and companionship to be "subjective." Miss. Code § 11-1-60(1)(a). Perhaps it believed that because pain and suffering were not quantifiable, they were not real. More metaphysically, maybe the legislature believed that at a certain level it was too difficult to discern how one person's pain and suffering could be compared to another's to justify a larger award, and therefore that all pain and suffering awards should be capped. We do not know all the reasoning behind that body's decision.

It also is critical to point out that a $500,000 cap is factually appropriate in many cases. In a recent decision, this Court awarded non-economic damages to a man who suffered significant internal bleeding after a colonoscopy, based on evidence that he passed fresh red blood through his rectum for 48 hours, genuinely feared bleeding to death during that time period, ultimately had half his colon removed in emergency surgery, and experienced months of discomfort and inconvenience afterward. *Hardy v. United States*, No. 3:09-CV-328, 2013 WL 1209647, at *6-8 (S.D. Miss. Mar. 25, 2013). In light of other state and federal court decisions awarding non-economic damages for medical negligence, an award of $375,000 was deemed appropriate for that plaintiff's individualized harm. *See id.* (collecting cases).

The facts of this case, however, are and hopefully always will be in a class by themself. Evidence at trial showed that before Tiara Clemons died, she "was 'screaming from pain and very restless,' . . . in obvious pain and distress," and "was experiencing extreme anxiety and distress,

16

accompanied by a feeling of suffocation and impending doom." Docket No. 62, at 16. Tiara Clemons was dying and *knew* she was dying. As one expert physician put it, "Tiara's death was a slow process, during which she was conscious and aware of what was going on around her, as well as conscious of her own mortality." *Id.* at 17. Even the doctor responsible for her death "admitted that Tiara was crying out for help," while at trial the government's attorneys had to acknowledge the "awful" panic she was suffering. *Id.* at 17. What stood between Tiara and her child's survival and death was a simple procedure the emergency room physician would not perform even with instructions from the EMTs.

What is worse is that Tiara was very pregnant. While her blood slowly filled the space occupied by her lung, drowning her, she must have known that her 30-week-old child was dying with her. The evidence, in fact, showed that her child Aubrey Anna suffocated to death in the womb. *Id.* at 18-19. Aubrey Anna most likely died 15 minutes before she arrived at an appropriately-staffed hospital, where she was delivered stillborn. *Id.* at 19. It is horrible to realize that those 15 minutes could easily have been made up for earlier in the day, were it not for the doctor's willful inaction. *Id.* at 19 n.29.

There are several other victims, too. Elona and Keontray lost their mother and sister. They are both under 10 years old. The income their mother and sister would have earned in life will be awarded to their grandmother, so Elona and Keontray will be able to purchase the necessities of life and, one hopes, pay for a four-year college degree and educational pursuits beyond a bachelor's degree. But they also will have to grow up without a mother's love and support. Placing an exact value on her absence is impossible, yes, as well as ultimately "subjective" at some level. But all feeling persons must agree that the value of growing up with one's mother is substantial – worth far more than the $500,000 limit the legislature has declared to be sufficient.

Kathy Clemons, who is Tiara's mother and Aubrey Anna's grandmother, had this to say about her loss: "It's always cold and hard. I wouldn't have ever thought I would lose my child like this." *Id.* at 21. The physician who delivered Aubrey Anna stillborn said that Kathy Clemons and her relatives "were very clearly just emotionally devastated." *Id.*

Each of these injuries was assigned a certain cost in the memorandum opinion. Tiara and Aubrey Anna's serious physical injuries caused them pain and suffering before they died, while Elona and Keontray's loss of companionship of their mother and sister, and Kathy Clemons' anguish

at losing her daughter and unborn grandchild, inflicted different kinds of harm. The damages for these injuries were calculated as follows:

| Non-Economic Damages Before Application of § 11-1-60(2)(a) | | |
|---|---|---|
| | *Resulting from Tiara's death* | *Resulting from Aubrey Anna's death* |
| *Physical pain and suffering of the deceased* | $1.5 million | $650,000 |
| *Mental anguish of the deceased* | $500,000 | -- |
| *Elona's loss of society and companionship* | $750,000 | $400,000 |
| *Keontray's loss of society and companionship* | $750,000 | $400,000 |
| *Kathy's loss of society and companionship[12]* | $250,000 | $250,000 |
| **Sub-total** | **$3.75 million** | **$1.7 million** |
| **Total: $5.45 million** | | |

Application of the statutory cap, however, results in the following:

| Non-Economic Damages After Application of § 11-1-60(2)(a) | | |
|---|---|---|
| | *Resulting from Tiara's death* | *Resulting from Aubrey Anna's death* |
| *Physical pain and suffering of the deceased* | $500,000 | $500,000 |
| *Mental anguish of the deceased* | $0 | -- |
| *Elona's loss of society and companionship* | $0 | $0 |
| *Keontray's loss of society and companionship* | $0 | $0 |
| *Kathy's loss of society and companionship* | $0 | $0 |
| **Sub-total** | **$500,000** | **$500,000** |
| **Total: $1 million** | | |

It is apparent that application of the cap reduces Tiara and Aubrey Anna's own pain and

_____

[12] This sum was not subdivided in the Court's earlier Order. Docket No. 62, at 21.

suffering below that amount shown by the evidence. It then values Elona, Keontray, and Kathy Clemons' losses at $0.

This is an absurd result because the value of having a mother, sister, and child is greater than $0. No reasonable fact-finder could assess the loss to the Clemons family at $0, no matter how intangible and subjective loss is.

All grief is not equal. All pain cannot be reduced to a one-size-fits-all sum. One cannot imagine what it is like to know that the doctor right in front of you, the one who is refusing to insert a chest tube into your body *even as nurses beg her* to provide that treatment, is causing you to die and killing your unborn baby as you are helpless to stop her. In Mississippi, though, one's suffering at the hands of a health care provider is worth no more than half a million dollars, no matter how egregious, and no matter if your suffering leads to your death, your unborn child's death, and leaves your children orphans. This is offensive.[13]

No other type of damages can make the Clemons family whole. Mississippi's cap on non-economic damages allows a plaintiff to collect punitive damages in the exceptional medical malpractice case. But punitive damages are not permitted in this case because the defendant is the government.[14] That is unfortunate, since there was strong evidence in this case showing that the government knew of but failed to act upon very serious deficiencies with the quality of the physicians and the medical equipment at the facility where Tiara and Aubrey Anna were treated. Docket No. 62, at 23-24. Based on that evidence, the Court earlier concluded that punitive damages would have been assessed in this case were the defendant not the government. *Id.* at 24.

Thus, the combination of Mississippi law on non-economic damages and federal law on punitive damages has reduced the plaintiff's recovery far below her actual damages.[15]

---

[13] On facts less grievous than these, Judge Tom Lee lamented that "but for the statutory cap, the court, taking into account *future* noneconomic damages, would have been inclined to award more than $500,000 . . . [and] the court would likely have awarded an amount approaching $500,000 for [the plaintiff's] *past* suffering, which clearly has been extreme." *West v. United States*, No. 3:07-CV-581, 2009 WL 2169852, at *7 n.5 (S.D. Miss. July 20, 2009) (emphasis added).

[14] Congress does not permit medical malpractice plaintiffs to recover punitive damages against the federal government. *See* 28 U.S.C. § 2674.

[15] The plaintiff also limited her own recovery to a total of $5 million by demanding that sum in her FTCA Notices of Claim.

The standard of review requires doubts of a statute's constitutionality to be resolved in favor of upholding the law. *See* Part II, *supra*. The undersigned obviously believes that § 11-1-60(2)(a) has a discriminatory effect as to the plaintiff and her family, leaving them without adequate remedy for their very real, serious injuries. And there may be doubts as to the correctness of the legislature's ostensible belief that capping non-economic damages lowers medical malpractice premiums; the parties presented no evidence on that point either way. But that is not enough. Doubts require upholding the statutory provision, and it cannot be said that the plaintiff has proven beyond a reasonable doubt that there is *no* possible rational basis for the legislature's action. Accordingly, her equal protection challenge must be denied.

Left unresolved in this section is the plaintiff's substantive due process challenge. "A violation of substantive due process . . . occurs only when the government deprives someone of liberty or property; or, to use the current jargon, only when the government works a deprivation of a constitutionally protected interest." *Simi Inv. Co., Inc. v. Harris Cnty., Tex.*, 236 F.3d 240, 249 (5th Cir. 2000) (quotation marks and citations omitted). To prove a substantive due process violation, the plaintiff must show that she has a protected property interest under Mississippi law and that the government's limitation of her right is not rationally related to a legitimate governmental interest. *Id.* at 250-51.

The plaintiff's substantive due process challenge fails for the same reason as her equal protection challenge: the State can articulate a rational basis for limiting non-economic damages in medical negligence cases. As a result, this challenge is denied.

### 3.     Takings Clause and Procedural Due Process

The plaintiff's final arguments are that § 11-1-60(2)(a) violates the Fifth Amendment's prohibition on "takings" without just compensation and the Fourteenth Amendment's prohibition on deprivations of property without procedural due process. Docket No. 69, at 52-57. The State responds that the plaintiff had no protected property interest in her full verdict because her suit was filed after § 11-1-60(2)(a) was enacted. Docket No. 73, at 28-29.

The Mississippi Supreme Court has found a similar takings argument "creative, but not persuasive." *Wells*, 645 So. 2d at 895. In that case, a child incurred $600,000 worth of medical expenses after a school bus accident injured him and several of his classmates. *Id.* at 885. At that time, Mississippi law provided persons injured in school bus accidents a maximum recovery of

$10,000 per person. *Id.* The trial judge dismissed his suit seeking more than $10,000. *Id.*

On appeal, the Mississippi Supreme Court affirmed and declined to invalidate the $10,000 cap under the takings clause, reasoning that its "'takings' jurisprudence has concerned the rights of property owners—typically real property owners—to be compensated where the State's action somehow diminishes the value of their property." *Id.* at 895. Because that court had "never construed the [takings] clause to apply to a cause of action," Wells' theory was unavailing. *Id.*

Under *Wells*, the plaintiff's takings challenge fails because her claim does not concern real property.

Regarding the procedural due process argument, even assuming the plaintiff is correct that Mississippi's wrongful death statute provided her a property interest in that cause of action, there is no constitutional violation because an additional hearing would not change the ultimate legal application of § 11-1-60(2)(a). There has been a substantial amount of process offered by the proceedings in this Court, during which the plaintiff was well-represented and argued every one of her theories of recovery and unconstitutionality. And she is obviously permitted an appeal as of right upon entry of a Final Judgment.

Because she has ample procedural safeguards, a procedural due process claim will not suffice to invalidate § 11-1-60(2)(a).

## IV.    Conclusion

For these reasons, the plaintiff's constitutional challenge is denied. A Final Judgment reflecting application of the statutory cap will issue this day.

**SO ORDERED**, this the 13th day of June, 2013.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

21